# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 03-1198

STATE OF LOUISIANA

VERSUS

DANNY RAY SHERMAN

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 267652
HONORABLE THOMAS MARTIN YEAGER, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## BILLY HOWARD EZELL
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Jimmie C. Peters, and Billy Howard Ezell, Judges.

Saunders, J., dissents and assigns written reasons.

**CONVICTION AND SENTENCE VACATED; REMANDED WITH INSTRUCTIONS.**

Glenn G. Cortello
Attorney at Law
711 Washington St.
Alexandria, LA 71301
(318) 445-0022
Counsel for: Defendant/Appellant
Danny Ray Sherman

**James C. Downs**
**District Attorney - Ninth Judicial District Court**
**701 Murray Street**
**Alexandria, LA 71301**
**(318) 473-6650**
**Counsel for: Plaintiff/Appellee**
**State of Louisiana**

**Noland James Hammond**
**Attorney at Law**
**P. O. Box 1841**
**Alexandria, LA 71309**
**(318) 443-7191**
**Counsel for: Defendant/Appellant**
**Danny Ray Sherman**

**Loren Marc Lampert**
**Walker, Passman & Michiels**
**3800 Parliament Drive**
**Alexandria, LA 71315**
**(318) 449-1565**
**Counsel for: Plaintiff/Appellee**
**State of Louisiana**

**Danny Ray Sherman**
**Rapides Parish Detention Center -3**
**7400 Academy Dr.**
**Alexandria, LA 71303**

**EZELL, JUDGE**.

The Defendant, Danny Ray Sherman, was charged by bill of information with possession of cocaine with intent to distribute, a violation of Louisiana Revised Statute 40:967. The defense filed a motion to suppress, which, after a hearing, was denied by the trial court. The Defendant was convicted of the charged offense and was sentenced to serve twenty years at hard labor. At the sentencing proceeding, the State filed a habitual offender bill, which, as of this writing, has not been heard by the lower court. The Defendant appealed his conviction, specifically, the trial court's denial of his motion to suppress. This court dismissed the appeal because it was unable, after repeated attempts, to obtain a copy of the trial transcript which it felt was necessary to review the assignment of error before it.[1] The Defendant filed a writ application in the supreme court and the case was remanded for this court to reconsider the Defendant's assignment of error regarding the denial of his motion to suppress. *State v. Sherman*, 04-1019 (La. 10/29/04), 886 So.2d 1116.

## FACTS

On November 13, 2002, the Defendant was approached by Alexandria Police Department Detectives and a U.S. Marshall working street drug interdictions. A subsequent search of the Defendant's pocket produced crack cocaine.

## ASSIGNMENT OF ERROR

The Defendant contends the trial court erred in denying his motion to suppress. The Defendant contends he was subjected to a *Terry* stop and the subsequent search of his pocket exceeded an authorized search for weapons. The State, on the other hand, contends the search of the Defendant's pockets was authorized as a search

---

[1]*State v. Sherman*, an unpublished appeal bearing docket number 03-1198 (La.App. 3 Cir. 2/4/04). The Defendant filed an application for rehearing which was denied on March 24, 2004.

1

incident to the Defendant's warrantless arrest for obstructing public passages, a violation of Louisiana Revised Statute 14:100.1. For the reasons assigned below, we disagree with the State.

At the hearing on the motion to suppress, there was undisputed testimony that on November 13, 2002, Alexandria Police Department Detectives Alton Horn and Lane Windham, Sergeant Newmon Bobb and a U.S. Marshall were working street drug interdictions together pursuant to a complaint that had been received from an unidentified source. The date that the complaint was received is not certain. The testimony regarding what they observed upon their approach of the Defendant is conflicting.

The supreme court stated in *State v. Martin*, 595 So.2d 592, 596 (La.1992), "when reviewing a trial court's ruling on a motion to suppress, we will consider the entire record, including the testimony presented at trial. *E.g., State v. Seward*, 509 So.2d 413 (La.1987); *State v. Phillips*, 444 So.2d 1196 (La.1984); *State v. Smith*, 332 So.2d 773 (La.1976)." *See also State v. Sherman*, 886 So.2d 1116, in which the supreme court stated, "[a]s a general rule, an appellate court may review the testimony at trial in determining the correctness of the trial court's pre-trial ruling on a motion to suppress. *State v. Green*, 94-0887, p. 11 (La.5/22/95), 655 So.2d 272, 280; *State v. Brooks*, 92-3331, p. 10, (La.1/17/95), 648 So.2d 366, 372; *State v. Martin*, 595 So.2d 592, 596 (La.1992)." The Court has had an opportunity to review the testimony associated with the motion to suppress and the testimony of the trial in this matter since the remand to this court.

Detective Horn testified that when he and the other officers were on Lincoln Road, one of the areas from which they had received complaints, they observed the Defendant standing in the middle of the street on a cellular phone, impeding the

2

normal flow of traffic. Detective Horn explained the Defendant was in the roadway and if a vehicle had come down the street it would have had to swerve to miss him. However, at trial, Detective Horn testified the Defendant was not standing in their travel lane; rather, he was standing in the other lane of travel. He further testified at trial that there were no people or cars around the Defendant. According to Detective Horn, the Defendant's motorcycle was parked on the side of the road in front of a residence. Specifically, he testified that there is an unimproved shoulder on the road and the motorcycle was "kind of in between the street and the gravel a little bit." Later, Detective Horn was asked if the motorcycle was off the road and he replied, "Not directly in the roadway, but on the road." At trial, Detective Horn testified that the motorcycle was in between the blacktop and the shoulder, but it was not "fully in the roadway." When questioned further, Detective Horn testified at trial that "The bike was kind of sitting at a - - in an angle type way. Not, not straight, but like the front wheel was like facing outward towards the road. . . . I guess you could say it was off the road." Upon reviewing the Defendant's exhibits, D-1, D-2, and D-3, the court is made aware of the space available to park a small motorcycle on the shoulder of the road in question.

As Detectives Horn and Windham exited their vehicle, they approached the Defendant and asked what he was doing. He told them that he was riding his motorcycle and it ran out of gas. The officers asked the Defendant if he had a driver's license "or something" and he told them he did not; however, they did not run a check to determine whether the Defendant had a license. After the Defendant denied having a license, Detective Horn searched him, recovering $10.00 and some crack cocaine. At trial, Detective Horn testified that Detective Windham asked the Defendant to take his left hand out of his pocket. Detective Horn's trial testimony was that he patted

3

the Defendant down for safety and in doing so he reached into his pocket and took out a ten dollar bill and a bag of crack rocks.

Detective Horn testified that he knew the Defendant prior to the encounter, but it was a "standard question" to ask for identification. Detective Horn was asked why he asked the Defendant for his driver's license and he replied, "[h]e stated he was driving his motorcycle and ran out of gas. . . [a]nd we check I.D."

Detective Horn's testimony regarding the nature of the contact between the officers and the Defendant was as follows:

> Q. . . . so when you approached Mr. Sherman was - - was your actions towards Mr. Sherman subject to a traffic stop? Were you making a traffic stop?
>
> . . . .
>
> A. No sir, it was not a traffic stop.
>
> BY MR. HAMMOND:
>
> Q. Had Mr. Sherman violated any laws standing where he was standing?
>
> A. He was standing in the roadway. Yes sir.
>
> Q. Were there any vehicles around - - - if we allowed what you say to be so, which we are not, what you are alleging here, were there any vehicles coming down the road at this particular time that Mr. Sherman was obstructing?
>
> A. No sir, none I can recall, sir.
>
> Q. So he was not violating the law.
>
> A. The vehicle was on the roadway.
>
> . . . .
>
> Q. Had he violated the law in any way with the motorbike that caused you to question him?
>
> A. He was driving without a driver's license.

4

According to Detective Horn, the Defendant was not issued a citation for obstructing the roadway. He was arrested for possession of cocaine with intent to distribute.

Detective Horn was questioned extensively about the reason for the search of the Defendant's pocket. According to Detective Horn, he patted down the Defendant for safety and did not feel any weapons. When asked why he searched the Defendant's pocket if he felt no weapon, Detective Horn testified, "Mr. Sherman had one of his hands in his pocket. I was just checking, normal routine, to make sure we would know what was in his pocket at the time." Later, Detective Horn testified, "I was just doing my search, sir. I said, I want to check your pockets, sir. And when I checked his pocket my hand went around it and I pulled out what was in his pockets." Not until the cross-examination, did Detective Horn affirm that it was because he feared for his safety that he placed his hand in the Defendant's pocket and extracted the contents. However, he never stated that upon patting down the Defendant he noticed anything that would indicate the Defendant was carrying a weapon.

Narcotics investigator Lane Windham testified that they observed the Defendant standing beside a motorcycle parked on the shoulder of the road. Detective Windham testified he saw the Defendant standing in the roadway and he affirmed that an automobile traveling southbound would have to either stop or go around the Defendant in order to proceed in that direction. He did not recall any vehicles being on the road when they approached the Defendant, but he confirmed that the Defendant was blocking at least one lane of travel. When asked whether the Defendant was standing off of the road next to his motorcycle as they approached, Detective Windham replied, "I don't remember exactly where he was standing." Detective Windham was asked more detailed questions about the Defendant's and the motorcycle's positions:

5

A. The initial line of questioning to start off with was why he was stopped in the middle of the road, why his motorcycle was in the travel lane. That's why we started talking to him.

Q. Why his motorcycle was where?

A. Was in the lane, the road, the roadway. That's why we stopped.

Q. His motorbike was in the roadway?

A. There in front of the residence.

Q. It wasn't off the road?

A. The way I understand it - - - the way I can remember, it was parked there in the roadway, yes, sir.

Q. Okay. You're talking about the gravel, not the - - - are you talking about the actual road?

A. It was on the - - - from what I can remember off of Lincoln Road, it's not really a shoulder there. It's just more or less like a gravel way.

Q. So it was off the road on the gravel?

A. Now I don't remember exactly if it was parked partially on the gravel or partially in the line of traffic, itself.

Q. Was it Mr. Sherman's bike or was it Mr. Sherman that was obstructing the - - - or in the middle of the road?

A. I don't remember if he was standing there, on what side of the bike.

Q. Okay. Technically, quote/unquote, there was no obstructing of traffic on this particular day, was there, Officer?

. . . .

BY MR. HAMMOND:

Q. As you approached Mr. Sherman on this day leading up to the questioning of Mr. Sherman he was not obstructing traffic, was he?

A. We were the only traffic on the road at the time.

Q. Yes, sir, but he was not obstructing traffic, was he?

A. No.

. . . .

6

BY MR. LAMPERT:

Q. Was he obstructing you? Could you have continued down the roadway without having to maneuver into other lane of traffic to get around either him, or his motorcycle or both?

A. Yes, sir, I would have had to maneuver around him.

Q. Any other automobile traveling in that lane of traffic, would they have had to maneuver into - - - around him into the other lane of traffic?

A. Yes.

Q. All right. Is Lincoln Road a public roadway?

A. Yes, sir.
   . . . .

RE-CROSS EXAMINATION
   . . . .

Q. So is this like a road only ten inches wide? And I say that as to say that only one vehicle pass down this road at a time?

A. No, two can pass.

Q. So Mr. Sherman would have had to have been in the middle of the road with his bike turned across the lines in order to obstruct both lanes. So you just said that he did - - - he was not obstructing traffic. Then he answered the counsel's question that he was obstructing y'all where y'all had to go around him. You weren't obstructed by Mr. Sherman by no means in your path of travel, were you?

A. Well I see what you're talking about. The way that I can remember the bike was it's a small, narrow road and in order to meet another vehicle you have to kind of be careful how you're doing it. If I was in the other lane coming the other way I would have been obstructed.

Q. Yes, sir, and I respect that.

A. Okay.

Q. But counsel asked you, "Did you have to maneuver around Mr. Sherman?" You didn't have to (Interrupted)

A. Okay. I'm - - - I'm sorry, I misunderstood the question then.

Q. Yes, sir.

7

A. Okay.

Q. Your lane was not obstructed, was it?

A. That's right.

Q. Okay.

At trial, Detective Windham testified that the Defendant was standing next to the shoulder of the road when they approached him. When asked for a more specific location, Detective Windham said, "I'd probably say he'd be on the blacktop." Detective Windham testified he did not run a check to see if the Defendant had a valid driver's license, but he does remember it being done.

Detective Newmon Bobb testified that the Defendant was standing in the road by a motorcycle parked on the street and that a vehicle traveling north would have had to go in the opposite lane of travel to get around the Defendant. According to Detective Bobb, to stand beside the motorcycle, a person would have to be in either the ditch or the lane of travel. Detective Bobb recalled that there was traffic on the road when they approached the Defendant, but he did not know if the traffic had to stop for the Defendant.

Detective Bobb was the head detective in the vehicle and he was asked why his officers approached the Defendant. He replied, "We were conducting what we call or what is called a street interdiction. Those officers are trained officers and they know what to look for when we get complaints of an area." Detective Bobb received a complaint, at some undetermined time, of drug activity in the area and that is why they were there. Detective Bobb was questioned in greater detail about the reason for approaching the Defendant:

Q. Well, what do you recall specifically about this incident, Officer Bobb?

8

A. I recall we were doing street corner interdiction at the time we made contact with Mr. Danny Ray Sherman. Officer Horn and Officer Windham were talking to him at that point. They advised me that they had found some crack cocaine inside of his pocket. At that time a unit was called to be transported and they continued their investigation as we continued on do - - - doing our street corner interdictions.

Q. So the purpose of the stop was street corner interdiction, drug investigation?

A. Correct.

Q. And Mr. Sherman at that point was the focus of the drug investigation?

A. At that time, yes, sir.

Q. And that's why the officers stopped and made a question of Mr. Sherman?

A. No, they did not. You're playing on my words, I didn't say that.

Q. Well, you said, Officer, at the time he was the focus of a drug investigation.

A. No. He was in that area where we were targeting, working and answering complaints in that area in (Interrupted)

Q. And he be (Interrupted)

A. . . . drug activity.

Q. Yes, sir.

A. And Danny Ray Sherman was there in the area where we had received a complaint at. We did not go there looking for Mr. Danny Ray Sherman.

          . . . .

Q. As simple as you working for drug interdiction and you see a man that you have had some past experience with; correct?

A. Correct.

Q. And because of the past you're going to investigate?

A. No. I wouldn't - - - his - - - his past doesn't have anything to do with we're going to continue the investigation. Sure, Mr. Danny Ray Sherman was there. So, however, I do know him. I don't know if the

9

other guys recognized him or not. We didn't talk about that. But Mr. Danny Ray Sherman was on the street. I did recognize him. I did not continue the investigation. Officer Horn and Officer Windham was the one that did the initial investigation. Being their supervisor I let them handle the field operation as far as going out and conducting their investigation.

At trial, Detective Bobb was asked if they initially approached the Defendant for a traffic violation. He responded, "There was a traffic violation" and he explained the Defendant was in the roadway blocking one lane of travel. Detective Bobb recalled that a school bus came by and had to veer around him. However, Detective Bobb is the only person there that recalls seeing any traffic on the road when they were approaching Mr. Sherman.

Wanda Reed, the resident of the home on Lincoln Road in front of which the incident occurred, testified that the Defendant knocked on her door and after learning that her boyfriend Richard was not there, asked if she had a gas can because he had run out of gas. Ms. Reed told him she did not, so he walked back out and stood by his motorcycle on the side of the street. Ms. Reed displayed the width of the gravel on the side of her road and counsel determined that it was "about a foot, foot and a half." She testified the traffic was not heavy that day and the Defendant was standing beside his motorcycle, which was completely off the road. At trial, Ms. Reed testified that both the motorcycle and the Defendant were on the side of the street in the gravel. When counsel asked Ms. Reed whether traffic could pass by without having to "stop around" the Defendant, she replied "yes." According to Ms. Reed, the handlebars of the bike were not over the road. Ms. Reed testified she did not hear any horns honking at the Defendant to get out of the roadway. However, Ms. Reed testified that she was not watching the Defendant when the police arrived. She was informed by her nephew that the police were there and when she went to the door, they had already arrested the Defendant. Ms. Reed's sister testified at both the

10

suppression hearing and trial and her testimony was essentially the same regarding the location of the Defendant and his motorcycle.

In denying the motion to suppress, the trial judge made the following comments:

BY THE COURT:

I don't think that they had reasonable grounds to believe that. I do think they had probable cause. I have a question about the obstruction of a public passage and whether or not it's an intentional act or a willful act. That's why I'm curious as to whether or not he could have moved the vehicle. But the - - - the last Mrs. Reed, Ms. Price, did her hands up like this when they asked about how much dirt there was on the side of the road. It was like twelve to eighteen inches. And if his motorcycle was parked on the side of the road I think that would cause problems with a small road anyway, with people being able to pass, two of them at a time.

. . . .

Well, Mr. Lampert said he had a right to arrest, number one, for Title 14:100.1, and also for no drivers license, not on person but no drivers license. And under Title 32 that is, you know, an offense that you can be arrested for because that is a Chapter 2 violation. Chapter 1 violation says shall issue a citation and Chapter 2, a police officer may arrest.

. . . .

They said he didn't have a drivers license. Let's say you win that. If he doesn't have a drivers license, he tells the police, "I've been riding that motorcycle and I ran out of gas" and he doesn't have a - - - he doesn't have a drivers license, they have a right to arrest him for not having a drivers license.

. . . .

Defense counsel pointed out to the court that Detective Horn testified that they did not check to see if in fact the Defendant had a valid driver's license, to which the judge responded:

I know. I wish he would have done that. I wish he would have checked to see if - - - I - - - I don't understand how they stop on the side of the road and someone says they don't have any gasoline in their motorcycle and they don't check - - - I mean, that would just drive me crazy. I would want to know. I don't understand that either. That would be two of the things that I would have done. But because they didn't do what I would have done that doesn't mean that their stop is not

11

- - - not valid.  I'm not real, real happy with the stop.  I think that - - - you know, but it's not my call as to whether or not they should have done it, or shouldn't have done it, or should have done it in a different way.

. . . .

That all has to do whether or not they believe he was standing on the street corner selling drugs.  And the probable cause for stopping him was not reasonable grounds to believe he was engaged in drug activity.  Their - - - their stop for him was based upon obstruction under Title 14, Section 100.1 and Title 32, Section 414 or whatever - - - whatever it is, no drivers license.

. . . .

That's not why they stopped him.  They were in the neighborhood for a drug investigation because of phone calls they received.  But they - - - someone didn't call him and say Danny Ray Sherman is on the street corner selling drugs.  He was in that neighborhood because of the complaints about drug activity.

So based upon the testimony of the witnesses and the argument of counsel, I will deny your Motion to Suppress.  I believe there was probable cause to stop, detain and arrest Mr. Sherman on November the 13th of 2002.

In *State v. Thomas*, 02-471, p. 3 (La.App. 3 Cir. 10/30/02), 829 So.2d 1137, 1139-40, *writ denied*, 02-2920 (La. 4/21/03), 841 So.2d 789, this court discussed the standard of review utilized by the appellate court in this situation:

When reviewing a trial court's denial of a motion to suppress, the appellate court looks at the totality of the evidence presented at the suppression hearing. *State v. Bargeman*, 98-617 (La.App. 3 Cir. 10/28/98);  721 So.2d 964, *writ denied*, 99-0033 (La.5/28/99);  743 So.2d 658.  Unless the trial court's conclusions are not supported by the evidence or there exists a clear abuse of discretion, an appellate court should not overturn the trial court's ruling.  *State v. Purvis*, 96-787 (La.App. 3 Cir. 12/11/96);  684 So.2d 567 (citing *State v. Burkhalter*, 428 So.2d 449 (La.1983)).  In other words, the appellate court will give the trial court's determination great weight and will not set aside the trial court's ruling unless clearly mandated by a preponderance of the evidence.  *State v. Lewis*, 97-1244 (La.App. 3 Cir. 3/6/98);  728 So.2d 1.

12

In *State v. Temple*, 02-1895, p. 4 (La. 9/9/03), 854 So.2d 856, 859, the supreme court stated:

> Although La.C.Cr.P. art. 215.1 permits an officer to stop a citizen in a public place and question him, the right to make such an investigatory stop must be based upon reasonable suspicion that the individual has committed, or is about to commit, an offense. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 899 (1968); *State v. Andrishok*, 434 So.2d 389, 391 (La.1983). If an officer stops a person pursuant to art. 215.1, the officer may conduct a limited pat down frisk for weapons if he reasonably believes that he is in danger or that the suspect is armed. La.C.Cr.P. art. 215.1(B). Determining whether "reasonable, articulable suspicion" existed requires weighing all of the circumstances known to the police at the time the stop was made. *State v. Williams*, 421 So.2d 874, 875 (La.1982).

It is clear the search in the instant case exceeded a pat down frisk for weapons as the officer actually entered the Defendant's pocket and retrieved the contents. Assuming a pat-down frisk was justified under the circumstances, there was no evidence that the officers detected what they believed to be contraband in the Defendant's pocket.

In *Minnesota v. Dickerson*, 508 U.S. 366, 375 113 S.Ct. 2130, 2137 (1993), the Supreme Court stated: "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons. . . ."

The question presented to this court is "was the stop and frisk encounter warranted?" The question can be answered by reviewing Louisiana Code Criminal Procedure art. 215.1 and *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868 (1968). *Terry* clearly sets out the procedure that is to be followed under the circumstances presented in this case. If the officer reasonably believes that he is in danger, he may frisk the outer clothing of the person for a weapon. If the officer reasonably believes that the person **has a weapon**, he may search him. This is where the facts of this case are

13

clear. The officer that frisked the Defendant did not at anytime, testify that upon his frisking of the Defendant he believed that the Defendant had a weapon on his person. There is no testimony that the Defendant attempted to resist the officer in any fashion. Just the opposite occurred. The Defendant answered the officers' questions when he was addressed about his purpose for being in the area. However, none of the officers ever checked the motorcycle to see, if in fact, it was out of gas. From the testimony presented one cannot say that the officers had the right to search the Defendant's pocket, after he had frisked the Defendant.

The stop and frisk itself is very questionable in lieu of the totally conflicting testimony of the police officers. In this case the officers all stated they were there for the purpose of drug interdiction. Not one of the officers testified as to when they got the complaint, that would have been the reason for them to be in the area. There was no testimony that the Defendant was a suspect in the commission of any crime or was about to or had committed a crime in that area. It is, however, clear that some of the officers involved had been in contact with the Defendant prior to this incident. However, this fact is not one that would legalize the stopping of the Defendant and frisking him.

This court finds that the plain view or feel exception set forth in *Terry* does not apply in this case. The State relies on the fact that the Defendant had violated Louisiana Revised Statute 14:100.1 and that, due to this fact, they would have discovered the contraband incident to a legal arrest.

In *State v. Temple*, 854 So. 2d 862, the supreme court stated, "As a general matter, police officers may make warrantless arrests if probable cause exists, that is, "when the facts and circumstances known to the arresting officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution

14

in believing that the person to be arrested has committed a crime." We find that there were neither facts and circumstances known to the arresting officer present, nor trustworthy information sufficient to justify a man of ordinary caution in believing that the Defendant who was arrested had committed a crime.

## OBSTRUCTION OF PUBLIC PASSAGE

Louisiana Revised Statute 14:100.1 provides in pertinent part:

> No person shall willfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, water craft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.

This court has had a fairly recent case concerning this statute. In *State v. Malveaux*, 03-276 (La.App. 3 Cir. 6/4/03), 852 So.2d 463, 467, this court found there was no probable cause to arrest the defendant for obstruction of a public passage under the following circumstances:

> The record indicates that Defendant was walking down the middle of the street and stopped as the officers slowed their patrol car. Because there is no testimony regarding the layout of Martha Street, it cannot be determined from the record whether that street is a one, two, or four lane roadway, or whether Defendant was walking down the center line of the street or in the middle of the lane in which the officers were traveling. Additionally, the officers did not testify that they could not have continued driving in their lane of travel because of Defendant's presence on the street.

The testimony of the officers is unclear as to where the Defendant was standing when the officers first saw him. However, it is clear that the Defendant was not obstructing the lane of traffic of the vehicle that the police officers were riding in. It is also clear that at some later time the officers began to focus on the motorcycle and where it was parked. It is also clear that none of these officers can say exactly where the motorcycle was parked in relation to the obstruction allegation, because they place the motorcycle in different places at the hearing on the motion to suppress and

15

the trial on the merits. It is also clear that the officers could not agree on where the Defendant was standing when they first saw him. This court in *State v. Malveaux*, 852 So.2d 463, found there was no probable cause to arrest the defendant for obstruction of a public passage. The facts of *State v. Malveaux* are not the same but, due to the lack of consistent testimony or the lack of testimony as to the charge under Louisiana Revised Statute 14:100.1, this court finds that there was reasonable suspicion or probable cause shown to support and arrest under Louisiana Revised Statute 14:100.1.

The testimony of the police officers in this matter does not meet the burden required, that being on objectively reasonable basis for stopping the Defendant for the purpose of obstruction the roadway. The closest case on point is *State v. Malveaux*; however, the present case is distinguishable from *State v. Malveaux* in that there was testimony that traffic would have had to maneuver around the defendant in *Malveaux* to proceed down the two-lane roadway. The court finds that there was no probable cause to arrest the Defendant for obstructing the roadway.

### NO DRIVERS LICENSE IN POSSESSION

The court must now consider the other issue, could the officer arrest the Defendant for failing to produce a driver's license?

Louisiana Revised Statutes 32:411.1(C)(1) and (2) state:

> C. (1) When an officer or agent of the department or any police officer of the state, or any parish or municipality has reasonable grounds to believe a person has committed an offense of driving without a valid driver's license in his possession, the police officer shall make every practical attempt based on identifying information provided by the person to confirm that the person has been issued a valid driver's license. If the police officer determines that the person has been issued a valid driver's license which is neither under revocation, suspension, or cancellation, but that the license is not in his possession, the peace officer shall issue a written summons to the offender in accordance with law, commanding him to appear and answer the charge.

16

(2) The provisions of this Subsection shall in no way limit the peace officer from issuing a citation for operating a motor vehicle without physical possession of a valid driver's license.

This provision is also contained in Louisiana Code Criminal Procedure art. 211.4:

A. When a peace officer has reasonable grounds to believe a person has committed an offense of driving without a valid driver's license in his possession, the police officer shall make every practical attempt based on identifying information provided by the person to confirm that the person has been issued a valid driver's license. If the police officer determines that the person has been issued a valid driver's license which is neither under revocation, suspension, or cancellation, but that the license is not in his possession, the peace officer shall issue a written summons to the offender in accordance with law, commanding him to appear and answer the charge.

B. The provisions of this Article shall in no way limit the peace officer from issuing a citation for operating a motor vehicle without physical possession of a valid driver's license.

The answer to this issue is found in *Garrett v. City of Bossier City*, 34,784 (La.App. 2 Cir. 6/20/01), 792 So.2d 24. In *Garrett* the plaintiff was arrested for not having a driver's license in his possession. He filed a civil suit against the city and the arresting officer. The trial court ruled in favor of the city and the officer and the plaintiff appealed. On appeal, the second circuit was called upon to determine whether the officer could arrest the plaintiff for failing to have a driver's license in his possession. After first citing Louisiana Revised Statute 32:411.1 and Louisiana Code Criminal Procedure art. 211.4, the court discussed the appropriate steps to be taken under the circumstances:

Officer Estess stopped Garrett for a seatbelt violation and requested his driver's license. Once he discovered that Garrett did not have a driver's license in his possession, the procedure the officer was directed to follow by La. R.S. 32:411.1(C)(1) and La.C.Cr.P. art. 211.4(A) was to make every practical attempt to confirm that Garrett had been issued a valid driver's license that was not under revocation, suspension or cancellation. Indeed, Officer Estess confirmed by radio dispatch that a Walter Garrett had been issued a Louisiana Driver's License that was not under revocation, suspension or cancellation and

17

that there were no outstanding warrants on him.

The issue presented in this case is whether Officer Estess made "every practical attempt" to determine the identity of the person standing before him. This question is easily answered. Officer Estess admitted that he made no effort to confirm through radio dispatch that Garrett was the person he said he was by matching him to the physical description contained in the driver's license. Further, the driver's license includes the licensee's date of birth, home address and social security number, information that Officer Estess could have first obtained verbally from Garrett then matched to the driver's license.

Officer Estess did not articulate a single reason to believe that Garrett might be giving him a false name. There is nothing in the record that would indicate that Garrett was abusive or uncooperative. Officer Estess obviously did not think that Garrett was driving a stolen vehicle because he did not check (although he could have done so) the vehicle registration to verify ownership, nor did he question Mrs. Garrett when he gave her the car keys. He made no effort to confirm that she was in fact Garrett's wife.

Bossier City submits that the officer's actions were justified because of a "directive" from Judge Mike Daniel. The memorandum contains a **recommendation** to Deputy Chief Teutsch to "always" jail all persons who are unable to produce a driver's license. By placing this memorandum in the officers' boxes, the ranking department heads were *de facto* initiating a policy, one clearly prohibited by statutory law. There was no evidence that the city checked the law to determine if Judge Daniel's recommendation was valid before distributing it to its officers.

The trial court correctly concluded that Officer Estess could not be held accountable for following a departmental "directive" and therefore, could not be held at "fault." The same cannot be said of the city. Bossier City was obligated to check out the recommendation before accepting it as departmental procedure. The city made no such check but simply distributed the directive to its officers.

Officer Estess carried out a *de facto* departmental policy that included the custodial arrest of a citizen whose "crime" was that he left his wallet containing his driver's license at home and who had no other **photographic** identification in his possession. The *de facto* policy did not allow the officer to make every "practicable attempt" to identify that the person had been issued a valid driver's license or to exercise his discretion to issue only a summons even if all such practical efforts were in vain.

We hold, therefore, that the custodial arrest of Garrett was, under La. R.S. 32:411.1(C) and La.C.Cr.P. art. 211.4(A), statutorily prohibited.

18

*Id.* at 27-28, (footnote omitted)(emphasis in original).

In the present case, none of the officers testified they made an attempt to determine whether the Defendant had a valid driver's license. Although Detective Windham testified at trial that he remembered this being checked, he did not know who did it and there was no testimony as to whether the Defendant had been issued a valid license which was not under revocation, suspension or cancellation. Pursuant to the requirements of Louisiana Revised Statute 32:411.1(C) and Louisiana Code Criminal Procedure Article 211.4(A) and under the circumstances of this case, the officers could not have effected a valid arrest of the Defendant for driving without a valid driver's license in his possession, but failed to follow the proper procedure to affect a valid arrest under Louisiana Revised Statute 32:411.1(C) and Louisiana Code Criminal Procedure Article 211.4(A).

The court finds there was no probable cause to arrest the Defendant for this offense, and any evidence found subject to a search based on the fact that the Defendant did not possess a valid drivers license should have been suppressed by the trial court. We find that any custodial arrest of Sherman under Louisiana Revised Statute 32:411.1(C) and Louisiana Code Criminal Procedure Article 211.4(A) is statutorily prohibited.

## RECOMMENDATION

The court finds the trial court erred in denying the motion to suppress, the Defendant's conviction and sentence are vacated, and the matter remanded for further proceedings.

**CONVICTION AND SENTENCE VACATED; REMANDED WITH INSTRUCTIONS.**

19

KA 03-1198
**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

STATE OF LOUISIANA

VERSUS

DANNY RAY SHERMAN

SAUNDERS, J. dissenting**.**

I respectfully dissent. The majority reverses the trial court's denial of defendant's motion to suppress, vacates the conviction, and remands. While the testimony regarding defendant's obstruction of the roadway was conflicting, I do not feel that the trial court abused its discretion in finding probable cause for the arrest. Because I believe the trial court was within its discretion on this point, I feel that the cocaine would have been discovered in a search incident to that arrest. As such, I feel that the trial court properly denied the motion to suppress and would affirm that ruling.