894 So.2d 515 (2005)
STATE of Louisiana
v.
Ralph N. MYLES.
No. 04-KA-677.
Court of Appeal of Louisiana, Fifth Circuit.
January 25, 2005.
*517 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Andrea F. Long, Kia M. Habisreitinger, Bobby R. Malbrough, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Margaret S. Sollars, Louisiana Appellate Project, Thibodaux, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., MARION F. EDWARDS, and WALTER J. ROTHSCHILD.
MARION F. EDWARDS, Judge.
Defendant, Ralph N. Myles, appeals his conviction for carnal knowledge of a juvenile. The State appeals the trial court's ruling which granted defendant's Motion To Quash Habitual Offender Bill of Information. For the following reasons, the defendant's conviction is affirmed, the State's appeal is dismissed, and we remand to correct errors patent on the face of the record.
On September 17, 2002, the Jefferson Parish District Attorney filed a bill of information *518 charging defendant, Ralph N. Myles, with carnal knowledge of a juvenile in violation of LSA-R.S. 14:80. Myles was arraigned on September 30, 2002 and entered a plea "in absentia" of not guilty.[1]
On May 22, 2003, the case was tried before a six-person jury which found Myles guilty as charged. On August 18, 2003, the trial court denied Myles' motion for new trial. On that same date, defendant waived sentencing delays, and the trial court sentenced him to imprisonment at hard labor for three years. Myles' motion for reconsideration of sentence was denied, and his motion for appeal was granted.
On June 5, 2003, the State filed a multiple bill alleging Myles to be a second felony offender. Myles denied the allegations of the multiple bill on August 18, 2003. The trial court denied the State's motion to continue the multiple bill hearing on October 14, 2003, so the State withdrew the multiple bill. On October 24, 2003, the State filed another multiple bill alleging defendant to be a second felony offender. On March 3, 2004, the trial court granted defendant's motion to quash the multiple bill. The State orally noted its intent to file an appeal.
F.A., age 16 at the time of the incident, testified that, on August 14, 2002, at approximately 1:15 p.m., she was outside her family's apartment talking on the phone when she saw Myles, age 27 at the time of the incident, who she knew as "Tim".[2] Myles, who lived near her in the apartment complex, told her he was going to the store and asked if she would be outside when he returned. F.A. received a call from defendant a short while later.
Myles asked F.A. who was at home with her, and she said she was alone. F.A. asked Myles where his girlfriend and the children were, and he told F.A. his girlfriend was at work and that his sister was watching the children. Myles then checked the meters by F.A.'s apartment, walked over to her apartment, pushed open the door, and walked inside. He kissed F.A. on her neck, led her upstairs, and went into F.A.'s bedroom. Myles undressed both of them, put on a condom, and he and F.A. proceeded to engage in sexual intercourse. F.A. testified that she consented to having sex with defendant, and that he did not force himself on her.
After she and Myles had sex, Myles received a call on his cell phone from his girlfriend, who told him she was on her way home. Myles jumped out of bed, put his clothes on, and left. F.A. testified that Myles went out of her back patio door, jumped the fence and went to his apartment. F.A.'s father came home shortly thereafter and asked what Myles was doing in his house. F.A. denied Myles had been there, but her father told her the man across the street had seen Myles go inside the house.
When F.A.'s mother came home, F.A. told her and her father that she had had sex with defendant. F.A. met with some detectives from the Jefferson Parish Sheriff's Office (JPSO) and gave a statement. She was taken to Children's Hospital where she underwent an examination.
F.A. testified that she and her neighbor, Travis, had given Myles her phone number, that Myles had called her approximately three to ten times over a two-month period, and that she had known Myles approximately two to three months prior to the incident. F.A. stated that she *519 met defendant when she was 15 years old, that she told him she was 16 years old, that he told her he was 19 years old, and that she did not learn he was 27 years old until the detectives told her. F.A. further stated that her date of birth was in May of 1986.
JPSO Deputy Kelly Day testified that she received a dispatch to a Metairie apartment regarding an argument between neighbors. When she arrived, she spoke to F.A.; L.A., F.A.'s father; F.A.'s mother; Daniel Gardner, the neighbor across the street who had spoken to F.A.'s father, and defendant.[3] After determining that this was a case involving consensual sex with a juvenile, she contacted the detective bureau and transported Myles to the bureau for further investigation.
JPSO Detective David Spera testified that he and his partner, Detective Craig Bonnette, received a call regarding an incident on Richland Avenue. When he arrived at the scene, he interviewed several individuals, including F.A. and Gardner. Later on that evening, Detective Spera advised Myles of his rights and took a statement from him that was played for the jury.
In that statement dated August 15, 2002, Myles said that he knew F.A. and that she lived next door to him at the apartment He stated that they had had sex that day in her bedroom in her apartment, and that she had let him in. Defendant explained that he had called her on the phone prior to that, and that she had told him she needed "some wood in her life," which meant to him that she wanted to have sex. He said that after she told him that, he went over there within a few minutes.
When he got there they hugged, and then they went upstairs to her bedroom. Myles stated that they got undressed and began to have sex. He said that the sex was vaginal and that he used a condom, which he flushed down the toilet. Defendant stated that this occurred at approximately noon or in the afternoon. When he was done, he went out the back door, jumped the fence, "fondled around" with the fuse box, and went into his apartment.
Myles said that he first knew something might be wrong when her father knocked on his door and said that it was his understanding that he had been in his house. Myles denied being there, and F.A.'s father left. He explained that the police came at approximately 10:00 p.m., and that he eventually told them what had happened. Myles stated that F.A. had told him she was 17 years old, and that he did not know how old she really was.
He said that F.A. knew him as "Tim," and that she sent her number to him through a "guy" who lived a couple of houses down. Myles stated that F.A. told the "guy" to give him her number approximately nine months ago, and that they had spoken during those nine months only about three times over the phone. He explained that, after they had sex, he left because he received a phone call from his girlfriend.
Once the statement was completed, Myles was placed under arrest.
JPSO Detective Craig Bonnette testified that he interviewed defendant along with Detective Spera, and that defendant said in his statement that his date of birth was January 16, 1975. Detective Bonnette further testified that he ran that information *520 through a computer to verify that that information was correct.
Daniel Gardner, a minister, testified that, on August 14, 2002, at approximately 1:15 p.m., he was outside his apartment complex when he observed defendant sitting on his door step talking on the phone. At that same time, he observed F.A. stand in her doorway while talking on the phone and then go back through her door, not closing her door all the way. Myles hung up the phone, got up, went to the end of his apartment building, lifted the breaker box, looked both ways, and closed it. Myles then walked inside F.A.'s front door and closed it. Gardner suspected that F.A. and defendant might be engaging in sexual intercourse because he knew that F.A.'s parents were not home.
At approximately 1:40 to 1:45 p.m., Myles came out of F.A.'s apartment through the back, jumped over the fence, came out through the breezeway, opened the breaker box, closed it, pulled his pants up, and went inside his apartment. When F.A.'s father got home at approximately 2:10 to 2:15 p.m., Gardner asked him whether anybody was supposed to be inside his house. F.A.'s father told him only his daughter was supposed to be there. Gardner proceeded to tell F.A.'s father that Myles had been inside his apartment. Gardner later spoke to the police and gave a statement.
L.A., F.A.'s father, testified that, on the day in question, he arrived home between 1:30 and 2:00 p.m. and had a brief conversation with Gardner who told him that defendant had been inside his apartment. L.A. went to his apartment and then to Myles' apartment to investigate. When Myles answered the door, he was dressed in a towel and had soap suds on him. L.A. asked Myles if he had been inside his apartment, but Myles said he had not, and that L.A. had him "mixed up" with someone else. L.A. went home and called his wife who was at work. When his wife came home, they discussed the incident and called the police.
The State rested, and the defense did not call any witnesses.
Myles' first argues that reversible error was committed when irrelevant and prejudicial testimony was presented and the defense was not able to present impeachment evidence. Specifically he contends that the trial court erred: (1) in allowing Deputy Day to testify as to what type of case determination she had made during her investigation; (2) in allowing Detective Spera to testify that the statute in question says that lack of knowledge of a victim's age is not a defense; (3) by excluding Gardner's taped statement allegedly indicating that the victim was sexually active; (4) in allowing F.A.'s father to testify that F.A. never talked to him individually about the incident, and by not allowing defense counsel to ask F.A.'s father if defendant had ever been to his house before.
The State responds that: (1) the testimony of Deputy Day and F.A.'s father was relevant and admissible; (2) the trial court properly allowed Detective Spera's testimony in light of defense counsel's cross-examination; and (3) the trial court properly excluded evidence of any alleged instances of past sexual behavior other than the offense charged pursuant to LSA-C.E. art. 412.
All relevant evidence is admissible, except where limited by law.[4] Relevant evidence is evidence that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than *521 without the evidence.[5] Although relevant, evidence may nonetheless be excluded, if the probative value is substantially outweighed by its prejudicial effect.[6] A trial judge's determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion.[7]
During the trial, the prosecutor asked Deputy Day what prompted her to call the detective bureau rather than handling the matter herself. She responded that detectives would normally take over "this kind of case." When the prosecutor next asked what kind of case she had determined this to be, defense counsel objected as to relevancy. The trial judge overruled the objection, and Deputy Day testified that she had determined the case involved consensual sex with a juvenile.
After a review of the record, we find that that Myles has failed to show that the trial judge abused his discretion in admitting the alleged objectionable portion of Deputy Day's testimony. Deputy Day's testimony that the case involved consensual sex with a juvenile was relevant to explain why the responding officer called the detective bureau to handle the matter rather than handling the investigation herself. Additionally, the testimony was not prejudicial, considering the fact that the jury already knew that Myles was charged with carnal knowledge of a juvenile, and it heard the other evidence at trial which indicated consensual sexual activity between Myles and the victim.
In regard to Detective Spera's testimony, the record shows that during the cross-examination of Detective Spera, defense counsel elicited testimony that indicated defendant was cooperative with the investigation. Defense counsel then stated, "[i]n fact, Mr. Myles wasn't sure what the whole problem was since he thought [F.A.] was seventeen years old." The prosecutor objected, arguing that ignorance of the victim's age was no defense.
The trial judge overruled the objection, saying that the prosecutor would have a chance to make his argument to the jury, and that the jury charges would contain that provision. Detective Spera then testified that Myles said that the victim had told him that she was 17 years old. Detective Spear further testified that he did not ask the victim how old she told Myles she was.
On redirect examination, the prosecutor asked Detective Spera how many times he had the opportunity in his years of experience with the JPSO to investigate cases involving carnal knowledge of a juvenile. Detective Spera testified, "[a] couple dozen." The prosecutor then asked whether it made any difference as to what age the victim might tell a defendant she is. Defense counsel objected, but the trial judge stated, "[i]n light of the cross-examination, I'll overrule the objection." Detective Spera testified that they used the statute to guide them in the investigation, and that the statute clearly says that's not a defense.
Redirect examination must be confined to the subject matter of the cross-examination and to the explanation of statements elicited on cross-examination; but the application of this rule is within the discretion of the trial court, provided that the opportunity for recross on the new *522 matter brought out on redirect is not denied.[8]
After a review of the record, we fail to find that the trial judge abused his discretion in admitting the alleged objectionable portion of Detective Spera's testimony. Defense counsel raised the issue of how old defendant thought F.A. was at the time the sexual activity occurred during his cross-examination of Detective Spera, as was pointed out in the State's brief. On redirect examination, the prosecutor was simply eliciting testimony from Detective Spera that it was irrelevant to the charged offense as to how old defendant thought F.A. was. In light of the foregoing, we find that the trial court did not err in overruling defendant's objection and admitting the testimony.
In the cross-examination of Gardner, defense counsel asked, "[w]hen you saw Ralph Myles go into the [As'] house with [F.A.], you immediately thought sexual intercourse?" Gardner responded, "[o]bvious, yes." Defense counsel then asked, "[n]ow had you seen this happen numerous times at that apartment?" The prosecutor objected, but the witness responded, "[n]o", before the trial judge sustained the objection.
Defense counsel showed Gardner page four of his statement and started reading it. The prosecutor objected, arguing that defense counsel was attempting to elicit testimony that the victim was sexually active. The trial judge sustained the objection. Defense counsel asked the trial judge to allow her to play Gardner's statement to the jury and to admit it into evidence.
The prosecutor objected, stating that the information or inference that the victim was sexually active was not admissible. The trial judge sustained the objection. Defense counsel then asked Gardner whether he had ever seen Myles come in and out of that apartment before. The prosecutor objected. The trial judge sustained the objection, and the following exchange occurred at a bench conference:
THE COURT:
Just for Record purposes, you're attempting to impeach him with a prior statement. Normally you can do that, except my ruling is that that subject matter, itself, is objectionable. And I sustain the objection to going into that subject matter. That's why I did not allow you to ask the question or to impeach the witness' prior statement.
MS. WHITE [Defense counsel]:
And you're also not allowing that statement to go in; is that right?
THE COURT:
Right. Well 
MS. WHITE:
Or to be played.
THE COURT:
The statement would never go in.
MS. WHITE:
I'd like to play it.
THE COURT:
You can impeach him with it but not on this topic. That's the point.
MS. WHITE:
Note our objection. Than [sic] you.
In his statement proffered as Defense Exhibit D-1 and dated August 14, 2002, Gardner said that he witnessed across the street the man in Apartment C on the telephone with the female in Apartment A at approximately 1:05. He stated that at approximately 1:15, the man from Apartment *523 C jumped up and walked toward the female's door at Apartment A, that the door opened, that he went in, and that the door was locked.
Gardner said that the female was not outside waiting for him, but that she had come outside approximately 20 minutes earlier. He indicated that he knew the family in Apartment A, but that he did not know the individual in Apartment C. Gardner opined that if anything unusual occurred around there, he would know who had "done it" after today. He stated that the man from Apartment C stayed in Apartment A at least 30 minutes, and that he had timed him, from 1:15 until he came out of the building at approximately 1:42, and that he had made it to the front of the building at 1:45.
Gardner explained that the man came out the back of the female's patio door, jumped over their back fence, came up through the breezeway, went to the breaker box pretending to be doing something, went back to his apartment, pulled up his pants, unlocked his door, and went into Apartment C. He stated that the female's father came home approximately 15 minutes later.
Gardner said he talked to the female's father before the father went inside, because he knew that the father did not allow anything like this to happen, and that the father did not know anything like this was going on. He stated that he knew something was not right, and that the father had told him earlier that he was in the building "over here" doing some work.
The portion of Gardner's statement regarding the alleged sexual activity of the victim is as follows:
DANIEL GARDNER:
So it was kind of unusual how it went, but it's a numerous of times [sic], probably, how this actually went. You know.
DET. DAVE SPERA:
Right.
DANIEL GARDNER:
That they making [sic], probably going on four (4). You know, So . . .
Gardner's statement was then concluded.
LSA-C.E. art. 412, which provides the law pertaining to the admissibility of evidence of the victim's past sexual behavior in sexual assault cases, is set forth in pertinent part as follows:
A. Opinion and reputation evidence. When an accused is charged with a crime involving sexually assaultive behavior, reputation or opinion evidence of the past sexual behavior of the victim is not admissible.
B. Other evidence; exceptions. When an accused is charged with a crime involving sexually assaultive behavior, evidence of specific instances of the victim's past sexual behavior is also not admissible except for:
(1) Evidence of past sexual behavior with persons other than the accused, upon the issue of whether or not the accused was the source of semen or injury; . . . or
(2) Evidence of past sexual behavior with the accused offered by the accused upon the issue of whether or not the victim consented to the sexually assaultive behavior.
C. Motion. (1) Before the person accused of committing a crime that involves sexually assaultive behavior may offer under Paragraph B of this Article evidence of specific instances of the victim's past sexual behavior, the accused shall make a written motion in camera to offer such evidence. The motion shall be accompanied by a written statement of evidence setting forth the names and *524 addresses of persons to be called as witnesses.
. . . .
F. Past sexual behavior defined. For purposes of this Article, the term "past sexual behavior" means sexual behavior other than the sexual behavior with respect to which the offense of sexually assaultive behavior is alleged. (Emphasis as found in the original.)
In State v. Zeringue,[9] this Court discussed the law regarding an accused's right to be confronted with the witnesses against him and his right to present a defense relative to LSA-C.E. art. 412 in pertinent part as follows:
The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to be confronted with the witnesses against him. The primary purpose behind this right is to secure for the defendant the opportunity for cross-examination. . . . Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. . . .
An accused also has a constitutional right to present a defense. . . . As a general rule, a party may attack the credibility of a witness by examining him or her concerning any matter having a reasonable tendency to disprove the truthfulness of his or her testimony. LSA-C.E. art. 607(C). The right of an accused sex offender to present a defense is, however, balanced against the victim's interests under LSA-C.E. art. 412, which is meant to protect the victim of sexual assault from having her sexual history made public. The rape shield law is precisely drawn to exclude evidence of the alleged victim's sexual history with persons other than the defendant. Subpart B(1) of the article does make an exception for "[e]vidence of past sexual behavior with persons other than the accused, upon the issue of whether or not the accused was the source of semen or injury. . ." . . .
The rape shield statute does not apply when a defendant attempts to use evidence of a victim's false allegations of improper sexual behavior to impeach the victim's credibility. . . . The relevant inquiry for the trial court in such an instance is whether reasonable jurors could find, based on the evidence presented by the defendant, that the victim made prior false accusations. . . .[10]
In the instant case, the record indicates that Myles did not file a motion to offer evidence of the victim's past sexual behavior as required by LSA-C.E. art. 412(C)(1). In State v. Hotoph,[11] this Court found that, because the defendant failed to make the proper motion under Article 412, he waived the right to introduce any evidence of the victim's past sexual history.
Additionally, we note that none of the exceptions relative to Article 412 are applicable. Myles did not allege that F.A. was making false allegations against him. In fact, he admitted to engaging in sexual intercourse with F.A., and he does not claim that she fabricated the incident. Evidence of past sexual behavior with defendant regarding whether F.A. consented to the sexually assaultive behavior in this case was not relevant, because both F.A. *525 and defendant admitted the encounter was consensual. Evidence of past sexual behavior with persons other than defendant was not relevant, because there was no issue as to injury or to whether defendant was the source of semen, as he and the victim both admitted that the encounter was consensual.
During trial, F.A. testified on direct examination that his daughter had never talked to him about this incident, but that she may have discussed it with his wife. When the prosecutor asked him whether his daughter had refused to discuss this incident with him, defense counsel objected to relevance, stating that F.A. had already testified. The trial court asked the prosecutor to respond.
The prosecutor said that the child was a minor, that she had an obligation to discuss things with her parents, that the father had an obligation to ask and investigate the incident, and that his question was whether she refused to discuss it with him. The trial judge overruled the objection, and F.A.'s father testified that she discussed the incident with him and his wife, but not with him individually.
Upon review, we note that the defendant has failed to show that the trial judge abused his discretion in admitting the alleged objectionable portion of L.A.'s testimony. As the State pointed out in its brief, F.A.'s willingness or unwillingness to discuss the incident with her father was relevant to establish the amount of and the basis for the father's knowledge of the events at issue and to place his actions in context at that time. Therefore, the trial court did not err in overruling defendant's objection and admitting the testimony.
During the cross-examination of F.A.'s father, F.A.'s father testified that it was a rule at his home not to have anyone there when F.A. was alone. Defense counsel asked the witness whether he was aware that defendant had been to her house before this day. The prosecutor objected, saying that that was the same information that the trial judge had just sustained an objection to. The trial judge sustained the objection.
We further find that the trial judge did not err in refusing to admit this testimony into evidence. It appears that defense counsel was again attempting to imply that F.A. was sexually active before this incident. For reasons previously discussed previously, we find that the trial judge properly excluded testimony of this nature.
In its sole assignment of error, the State argues that the trial court erred in granting the defendant's Motion to Quash Habitual Offender Bill of Information. It contends that, since the principles of res judicata and double jeopardy are inapplicable to a multiple bill proceeding, the trial court erred in concluding that the initial multiple bill was dismissed "with prejudice."
Myles responds that the granting of the motion to quash should be affirmed, because the State's appeal was untimely, the State filed no written motion showing an intent to file either a writ or an appeal, the State did not timely designate the motion to quash transcripts as necessary for the record contrary to the mandatory language of LSA-C.Cr.P. art. 914.1, and the preferred method for a review of a motion to quash is by seeking a writ of review.
Conversely, the State responds that it made a timely oral motion for appeal of the trial court's ruling and that it was not required to file a written motion for appeal as set forth in LSA-C.Cr.P. art. 914. It also contends that Myles has not demonstrated any prejudice with respect to the timeframe of the State's appeal.
*526 LSA-C.Cr.P. art. 912(B)(1) provides that the State may appeal from a judgment or ruling on "[a] motion to quash an indictment or any count thereof." However, the Louisiana Supreme Court has held that, under that article, the State has no appeal from the quashing of a multiple offender bill of information because it does not charge a substantive crime, but merely enhances the penalty.[12] The Louisiana Supreme Court has also held that when the State seeks review of a final pre-conviction judgment or ruling in a criminal case, that review is possible only under the Court's supervisory jurisdiction, available by application for writs of review, not under the Court's appellate jurisdiction.[13] Moreover, since this Court's order of December 9, 1994, this Court will no longer convert improperly filed appeals into the more appropriate procedural mechanism of writs under the guise of judicial economy.[14]
Accordingly, for the foregoing reasons, we dismiss the State's appeal, reserving the right to the State to file its application for writ of review within thirty days of the date of this opinion.[15]
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920, State v. Oliveaux,[16] and State v. Weiland.[17] The following matters are noted:
Because defendant was convicted under LSA-R.S. 14:80, a "sex offense" as defined by LSA-R.S. 15:541(14.1), notification of the sex offender registration requirements is mandated.[18] However, the record does not indicate that the trial judge provided defendant with notification of the registration requirements of LSA-R.S. 15:542 as required by LSA-R.S. 15:543(A). Therefore, we remand the matter and order the trial court to inform defendant of the registration requirements of LSA-R.S. 15:542 by sending appropriate written notice to defendant within ten days of this opinion, and to file written proof in the record that defendant received such notice.[19]
Defendant was not present at his arraignment. LSA-C.Cr.P. art. 831 provides in pertinent part:
Art. 831. Presence of defendant when prosecution is for felony
A. Except as may be provided by local rules of court in accordance with Articles 522 and 551, a defendant charged with a felony shall be present:
(1) At arraignment;
. . . .
B. Nothing in this Article shall prohibit the court, by local rule, from providing for a defendant's appearance at his arraignment by simultaneous audio-visual transmission, except when the defense counsel requests the defendant's appearance in open court.
LSA-C.Cr.P. art. 551 provides as follows:
Art. 551. Arraignment of defendant
A. The arraignment consists of the reading of the indictment to the defendant by the clerk in open court, and the *527 court calling upon the defendant to plead. Reading of the indictment may be waived by the defendant at the discretion and with the permission of the court. The arraignment and the defendant's plea shall be entered in the minutes of the court and shall constitute a part of the record.
B. Nothing in this Article shall prohibit the court, by local rule, or the defense counsel from providing for a defendant's appearance at his arraignment by simultaneous audio-visual transmission. The court may, by local rule, provide for the defendant's appearance at the arraignment and the entry of his plea by way of simultaneous transmission through audio-visual electronic equipment.
LSA-C.Cr.P. art. 553 provides as follows:
Art. 553. Method of pleading
A. Except when otherwise provided under Paragraph B of this Article or by local rule in accordance with Article 551, the defendant in a felony case shall plead in person. . . . The plea shall be made in open court and shall be immediately entered in the minutes of the court. A failure to enter a plea in the minutes shall not affect the validity of any proceeding in the case.
B. By rule adopted pursuant to R.S. 13:472, the judge of the district court or a majority of the judges in a multi-district court may permit the defendant in a noncapital felony case to waive formal arraignment and enter a plea of not guilty without pleading in person. The rule shall require that the plea be in writing and shall set forth the filing procedure. Any formal defect shall not affect the validity of the proceeding.
. . . .
Local District Court Rule 18.0 provides as follows:
Rule 18.0 Waiver of Formal Arraignment
A defendant in a non-capital felony case may waive formal arraignment and enter a plea of not guilty without appearing in person. The motion must be in writing and must comply substantially with the form in Appendix 17.
In the instant case, the record contains a pleading entitled, "Motion, Affidavit and Order to Waive Defendant's Presence at Arraignment," which provides that defendant was aware he had the right to be present at arraignment, but wished to waive this right and have legal counsel appear on his behalf. The pleading was signed by Myles, a notary, and defense counsel. The order was signed by the judge on September 30, 2002. It is noted that the copy of the pleading contained in the file has no stamp indicating it was filed into the record.
The motion in the record is very similar to the motion contained in Appendix 17 of the Local Rules of Court, except that a sentence was omitted: "Defendant desires to enter his plea by audio visual transmission."
However, LSA-C.Cr.P. art. 555 sets forth as follows:
Art. 555. Waivers
Any irregularity in the arraignment, including a failure to read the indictment, is waived if the defendant pleads to the indictment without objecting thereto. A failure to arraign the defendant or the fact that he did not plead, is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pleaded not guilty.
The minutes do not indicate whether Myles was arraigned via audio visual transmission in accordance with the above-cited *528 articles and Local Rule 18.0. However, defendant did not object to the failure to arraign him in person prior to proceeding to trial or prior to pleading to the bill; therefore, any irregularity in the arraignment procedure or lack thereof is waived.[20] When there has been a failure to arraign a defendant, it is considered as if he pled not guilty.[21]
Accordingly, for the foregoing reasons, the defendant's conviction is affirmed; the State's appeal is dismissed, however, we reserve the right to the State to file its application for writ of review within thirty days of the date of this opinion. This case is further remanded to correct errors patent on the face of the record.
AFFIRMED IN PART: DISMISSED IN PART; REMANDED.
NOTES
[1] See Error Patent Discussion.
[2] In accordance with LSA-R.S. 46:1844, the victim will be referred to by the use of initials in order to protect her identity.
[3] F.A.'s father will be referred to by his initials in order to protect the identity of his daughter.
[4] LSA-C.E. art. 402.
[5] LSA-C.E. art. 401.
[6] LSA-C.E. art. 403.
[7] State v. Sandoval, 02-230 (La.App. 5 Cir. 2/25/03), 841 So.2d 977, 985, writ denied, 03-853 (La.10/3/03), 855 So.2d 308.
[8] State v. Bourgeois, 00-1585 (La.App. 5 Cir. 3/14/01), 785 So.2d 848, 854 (citing State v. Billiot, 94-2419 (La.App. 1 Cir. 4/4/96), 672 So.2d 361, 372, writ denied, 96-1149 (La.10/11/96), 680 So.2d 655).
[9] 03-697 (La.App. 5 Cir. 11/25/03), 862 So.2d 186, 195-196, writ denied, 03-3523 (La.4/23/04), 870 So.2d 298.
[10] Id. at 195-196 (citations omitted).
[11] 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1047, writs denied, 99-3477 (La.6/30/00), 765 So.2d 1062; 00-0150 (La.6/30/00), 765 So.2d 1066.
[12] State v. Sanders, 337 So.2d 1131 (La.1976), citing State v. Jackson, 298 So.2d 777 (La.1974).
[13] Sanders, 337 So.2d at 1132-1133, citing State v. James, 329 So.2d 713 (La.1976).
[14] State v. Goodman, 03-1279 (La.App. 5 Cir. 2/23/04), 868 So.2d 861, 862.
[15] Goodman, supra.
[16] 312 So.2d 337 (La.1975);
[17] 556 So.2d 175 (La.App. 5 Cir.1990).
[18] LSA-R.S. 15:540 et seq.
[19] State v. Hotard, 03-435 (La.App. 5 Cir. 12/30/03), 864 So.2d 748, 758.
[20] See, LSA-C.Cr.P. art. 555; State v. Smith, 02-1018 (La.App. 5 Cir. 3/11/03), 844 So.2d 119, 126.
[21] LSA-C.Cr.P. art. 555; State v. Burns, 04-175 (La.App. 5 Cir. 6/29/04), 877 So.2d 1073, 1074.)