918 So.2d 466 (2006)
STATE of Louisiana
v.
Edward WILLIAMS, Jr.
No. 05-KA-317.
Court of Appeal of Louisiana, Fifth Circuit.
November 29, 2005.
*468 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Bobby Ray T. Malbrough, Assistant District Attorneys, Twenty-Fourth Judicial District, Parish of Jefferson, Gretna, Louisiana, for Plaintiff/Appellee.
Margaret S. Sollars, Louisiana Appellate Project, Thibodaux, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY, and CLARENCE E. McMANUS.
THOMAS F. DALEY, Judge.
Defendant, Edward Williams, Jr., appeals his convictions of aggravated rape of a juvenile and sexual battery of a juvenile. He assigns three errors by the trial court: 1) the trial court erred by failing to suppress the defendant's statements; 2) the defendant's Motion to Sever the offenses should have been granted; and 3) the trial court erred by ordering the sentences to be served consecutively. For the following reasons, we conditionally affirm the convictions. Because defendant filed a timely Motion for New Trial in the trial court that was not ruled upon, we vacate defendant's sentences, and remand for disposition of that Motion and for resentencing.

PERTINENT PROCEDURAL HISTORY
On April 17, 2003, defendant, Edward Williams, Jr., was indicted by a Jefferson Parish Grand Jury for two counts of aggravated rape of a juvenile in violation of LSA-R.S. 14:42 (Counts 1 and 3) and two counts of molestation of a juvenile in violation of LSA-R.S. 14:81.2 (Counts 2 and 4). Counts 1 and 2 pertained to victim A.L. Counts 3 and 4 pertained to victim B.B. Defendant was arraigned on April 24, 2003 and pled not guilty.
The trial court granted defendant's Motion to Sever the two rape charges from the two molestation charges on August 13, 2003. On August 13, 2003, October 22, 2003, December 10, 2003, and December 17, 2003 hearings were held on defendant's Motion to Suppress statement. On December 17, 2003, the trial court denied the Motion to Suppress.
On October 12 and 13, 2004, the two rape charges were tried by a jury, which found defendant guilty as charged on one count and guilty of sexual battery on the other count. Defendant filed a Motion for New Trial on October 27, 2004. The minute entry indicates that defendant's Motion for New Trial was denied on October 28, 2004; however, the transcript reveals that the trial court did not rule upon the motion, but rather set it for hearing on December 2, 2004.
On November 15, 2004, the State nolle prossed the two molestation counts. On that same date, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on the rape conviction, and imprisonment at hard labor for ten years on the sexual battery conviction, with the sentences to run consecutively. Defendant filed a Motion for Appeal that was granted. It does not appear that the *469 trial court ever ruled upon the Motion for New Trial.

MOTION FOR NEW TRIAL
LSA-C.Cr.P. art. 853 provides that a Motion for a New Trial must be filed and disposed of before sentencing. The trial court erred in failing to rule on defendant's timely filed Motion for New Trial. Defendant did not raise this issue on appeal; however, the State mentioned it in its brief.
This Court has remedied such errors by conditionally affirming the defendant's conviction, vacating the sentence, and remanding for rulings on the defendant's motions. State ex rel. T. J., 01-384 (La.App. 5 Cir. 10/17/01), 800 So.2d 969, 973; State v. Wilson, 96-251 (La.App. 5 Cir. 10/1/96), 683 So.2d 775. Therefore, we conditionally affirm defendant's convictions, vacate defendant's sentences, and remand for a ruling on defendant's Motion for New Trial.

FACTS
Omalee Gordon, a forensic interviewer with the Children's Advocacy Center, testified that she conducted a videotaped interview of A.L.[1], the victim in Count 1, which was played for the jury. In that interview, dated March 5, 2003, A.L., age 12, stated that defendant, her stepfather, had sex with her for the first time when she was eight or nine years old during the summer after fifth grade in her room in their house on Second Street in Marrero. She said that this occurred three times while they lived there. A.L. said that defendant came into her room, put his "equipment" in her vagina and afterwards, told her not to tell anyone.
A.L. stated that the last time defendant had sex with her was a couple of weeks prior to the interview in their house on Benedict Street. She stated that she came home from school that day, took a bath, went into her room, and began to do her homework, and that defendant came in, told her to take off her clothes, put his "equipment" in her vagina, and told her afterwards not to tell anyone. She also stated that defendant put his mouth on her vagina one time. A.L. said that defendant had sex with her more than one time in his room and one time in her room while they lived on Benedict Street.
A.L. said that no one was home at the time these incidents occurred, as her brothers were outside and her mother was at work. A.L. stated that the first and only person she told that defendant was having sex with her was her stepsister, A.W., age 14, defendant's daughter.
Dr. Scott Benson, who was qualified as an expert in forensic pediatrics, testified that he supervised Dr. Mirama Parallis when she evaluated A.L. on February 26, 2003. The history A.L. related to Dr. Parallis was very similar to the history she gave to Gordon in the videotaped interview. Dr. Benson conducted a physical examination of A.L., and testified that the physical examination was normal; i.e., it neither confirmed nor denied sexual abuse. He explained that it was possible to have penetration into the vagina and have a normal examination, and that most of the time, they could not tell from an examination whether someone was sexually active, even a child.
B.B., the victim in Counts 3 and 4, was 24 at the time of trial and testified that defendant was once married to her sister, A.F. She stated at trial that in 1988, when she was eight years old, she was living at *470 her mother's house with her sister, defendant, and her aunt. B.B. testified that defendant used to stick his tongue in her mouth and pull her pants aside and try to see inside. B.B. testified that defendant also "tried to put it in" and that she could feel his penis on her vagina, but that he never had a chance to fully penetrate her because her sister was always home. B.B. further testified that these incidents occurred in her sister's bedroom or in the car when he took her to church on Sundays, and that they occurred when she babysat for defendant and her sister or when her sister went to work.
B.B. maintained that the inappropriate touching began in 1988 and that it continued until she was 12 years old when she started menstruating. She testified that defendant stopped touching her because he and her sister got divorced shortly thereafter and that defendant no longer lived in her mother's house. B.B. said that she saw defendant even after the divorce, because defendant used to go to Walgreen's while she was working there, and would lick his lips and tell her she still looked good.
Jefferson Parish Sheriff's Office (JPSO) Detective David Spera testified that defendant was arrested and taken to the bureau, where he advised defendant of his rights and took two statements from him. Defendant denied any misconduct in his first statement. In his first statement dated February 24, 2003 at 12:50 a.m., defendant said that he did not have sex with A.L., but that he had thought and dreamt about having sex with her. Defendant stated that they played and wrestled, and that his hand might have accidentally slipped and hit her in one of her private places. He explained that A.L. used to sit on his lap, but he would make her move because he got an erection. Defendant stated that A.L. accidentally hit his penis when they were in the water at the pool.
Defendant said that he sometimes drank heavily and smoked marijuana and did not remember everything he did. He stated that sometimes he had sex with people and did not remember it, but that he could not have had sex with A.L. and not remembered it. Defendant said that he was "highly sexually active", that he and his wife had problems, but that did not lead him to have sex with A.L. because he had sex with his "other little friend." Defendant explained that he knew how A.L. felt with someone touching her because when he was eight years old his grandfather molested him by always playing with his penis. Defendant also stated that his uncle molested him when he was 12 years old and that his uncle used to try to "get his thing" in defendant's "booty."
In his second[2] statement, dated February 24, 2003 at 10:41 a.m., defendant said that he recalled four incidents with A.L. He stated that the first incident occurred on Second Street when A.L. was approximately 11 years old. Defendant explained that he and A.L. were in the front room playing, and that, while he was standing, A.L. would jump on him and wrap her legs around his hips, with her body parts meeting his body part. Defendant told A.L. not to do that.
Defendant said he got an erection and knew he should not so he left, got a beer, and sat down on the couch. He stated that A.L. came and sat down on him and that they "just kind of got to rolling each other a little bit." Defendant told her again she should not do that and pushed *471 her off. Next, defendant went into the bedroom and asked A.L. to let him see her vagina, which she did. He said that he looked at it, but did not touch it. Defendant explained that he unzipped his zipper and let her touch "it" with her hand.
Defendant stated that the next time it happened was when they were living on Benedict Street about six months to a year later. Defendant said that A.L. was looking at one of his "sex tapes," and he told her to turn it off. They went to the bedroom, she took her shorts off, and he put "the tip on it" for approximately two minutes. Defendant said the next time, they were horse playing as they normally did and she sat on his lap. When he told her to get up (because he had an erection), she said he did not love her anymore, so they "hooked up." They went into the bedroom, she took off her bottoms and he pushed his pants down, and he got on top of her. Defendant said he went in a little more than the last time, but that she jumped so he stopped. He stated that the last time occurred after her science teacher called and left a message that A.L. had been cheating. A.L. asked him not to tell her mother. He said he would delete the message if A.L. would "go holler" with him, which he explained meant have sex. They then went into the room, she pulled her shorts to the side, he took his "thing" out, and she grabbed him from the back, pushing and pulling him. Defendant said he went in as far as he did last time, and that this went on for approximately two or three minutes.
In his third statement, dated February 24, 2003 at 11:35 a.m., defendant said he engaged in horse playing and kissing with B.B., and that they might have done "some rolling." He explained that "rolling" was when she was on top of him or he was on top of her or they were standing up close together, like pretend sex with clothes on. Defendant said that it never progressed to sex with B.B. He stated that he and B.B. used to play house where B.B. pretended to be his woman, and that was when they engaged in the kissing and horse playing. Defendant said that B.B. was about 15 years old at the time.
After the State rested, the defense called A.F., who testified that she and defendant married in January of 1990 and separated in September of 1991, and that they had two children. A.F. further testified that she never witnessed any sexual advances or inappropriate touching between B.B. and defendant.
A.W. testified that defendant was her father and that he never touched her inappropriately. She further testified that A.L. told her that defendant used to make her kiss him and get on top of him, and that it happened more than one time. A.L. told A.W. not to tell anybody.
T.L., A.L.'s mother, testified that she and defendant had been married for approximately four years. She further testified that she never saw defendant engage in any indecent behavior with A.L., and that she did not notice a change in A.L. that would indicate to her that something had happened to her. T.L. brought A.L. to the hospital after she heard the allegations regarding sexual abuse, and A.L. told her that defendant had been sleeping with her.
Defendant testified that he did not make sexual advances towards B.B., that he never touched B.B. when B.B. was in the vehicle with him going to her aunt's house before she went to church, and that he did not know why B.B. would make those allegations. Defendant denied touching B.B. inappropriately or putting his fingers in her private areas.
Defendant further testified that he never touched A.L. in an inappropriate way, *472 that he and A.L. did not have sex, that he did not sexually abuse A.L., and that he did not know why A.L. would make those allegations. He opined that A.L. might have been jealous of A.W., that A.L. was scared of her mother, or that A.L. wanted attention.
Defendant testified that Lieutenant Pernia told him that he was guilty, that she had DNA evidence, and that if he did not give another statement she would see to it that he "got the needle". He said that she also promised him she would "get the D.A." because he was a good friend of hers. Defendant testified that he told the detective what he wanted to hear in his (second and third) statements because he thought that his life was "on the line" and that, if he talked, his life would not be "on the line." He maintained that he was forced to say things in his statements regarding B.B. and A.L. that were not true. Defendant testified that the first statement was true, but that the other two were not.
A.L. was called by the defendant and testified that she told A.W. that her father was touching her. A.L. further testified that she did not jump on defendant's person and slide down his body, that she never wrapped her legs around his hips, that she did not sit on his lap, that they did not "roll" on each other, and that defendant never told her to get off of him. She testified that she did not touch defendant on his private areas, and that she and defendant did not do anything after watching the videotape.
A.L. explained that defendant asked to see her vagina and that she showed it to him, and that defendant would kiss her on the lips and put his tongue in her mouth. She remembered asking defendant to erase a message from her science teacher on the answering machine. She testified that defendant said if he erased it, she would have to do something with him, and that she did something with him. A.L. said her stomach hurt and started crying in the courtroom. Defendant also started crying, and the defense rested. The State called no rebuttal witnesses.
After hearing the testimony and considering the evidence, the jury found defendant guilty as charged on one count (aggravated rape of A.L.) and guilty of sexual battery on the other count (with B.B.).

ASSIGNMENT OF ERROR NUMBER ONE
Defendant argues that the trial court erred by failing to suppress his (second and third) statements. He contends that those statements were not freely and voluntarily given because he was sleep deprived, intimidated, threatened with death if he did not confess, and told what to say by the detectives.
The State responds that defendant was informed of his constitutional rights and that he freely and voluntarily waived them before giving his statements. It further responds that the record does not reveal any coercion, trickery, or improper interrogation. Thus, the State contends that the trial court's denial of the Motion to Suppress was correct.
On August 13, 2003, October 22, 2003, December 10, 2003, and December 17, 2003, hearings were held on defendant's Motion to Suppress statements. Deputy Perry Esponge testified at the suppression hearing on December 10, 2003 that on February 23, 2003, he got a radio dispatch call requesting that he locate defendant. Deputy Esponge testified that he eventually located defendant who agreed of his own free will to accompany him to the bureau for questioning. The deputy noted that he did not tell defendant what the investigation was regarding, that defendant did not ask, and that he did not place defendant under arrest or read him his *473 rights. Deputy Esponge testified that he drove defendant to the bureau where he released him into Sergeant Graffeo's custody.
Sergeant Graffeo testified at the suppression hearing in October of 2003 that State's Exhibit 1 was a rights of arrestee form that he filled out on February 23, 2003 at 11:30 p.m.[3] He further testified that he read defendant his rights from that form, and that defendant indicated to him he understood those rights.
At the suppression hearing in August of 2003, Sergeant Graffeo testified that he took a recorded statement from defendant on February 24, 2003 at 12:50 a.m. He further testified that he advised defendant of his Miranda[4] rights again at the beginning of the statement, and that defendant indicated he understood those rights. Sergeant Graffeo asserted that he did not promise anything to defendant for his statement, including leniency with the district attorney, nor did he use any physical force or threat of physical force. He maintained that he did not suggest to defendant what the answers might be, nor did he tell defendant what to answer.
Sergeant Graffeo explained that before he turned on the tape recorder, he spoke to defendant regarding what they were going to be talking about, that he took notes from that interview, and that he did not keep the notes once he made his report. He testified that the statement ended at 1:25 a.m. Sergeant Graffeo noted that defendant denied any wrongdoings during that statement.[5]
Detective Dave Spera testified at the August suppression hearing that he advised defendant of his rights and that defendant waived those rights by executing a rights of arrestee form on February 24, 2003 at 9:30 a.m.[6] Detective Spera further testified that defendant initialed by each of his rights on the form and verbally told him that he understood he was waiving each of those rights. Detective Spera indicated that he took two statements from defendant on February 24, 2003: the first one began at 10:41 a.m. and ended at 11:01 a.m., and the other one began at 11:35 a.m. and ended at 11:40 a.m.
Detective Spera noted that he reviewed the rights form again with defendant during the first statement and that defendant again indicated he understood and waived his rights. He also noted that, in the second statement, he reminded defendant of the rights they had gone over previously. Detective Spera testified that he did not threaten, intimidate, beat, or coerce defendant into giving a statement, nor did he tell defendant if he talked to him that he would help defendant in the criminal prosecution. He maintained that he did not tell defendant what to say before the statement was recorded. Detective Spera testified that he took handwritten notes during the pre-interview and destroyed them once he wrote his report. Detective Spera noted that Lieutenant Pernia was in the room with defendant before he went in to take the statement.[7]
*474 Detective Michael Cummings testified at the August suppression hearing that he was present when Detective Spera took two statements from defendant. His testimony largely corroborated that of Detective Spera. Additionally, Detective Cummings testified that Lieutenant Pernia came into the room where defendant and Detective Spera were sitting at one point, asked Detective Spera some questions, and then left.
Lieutenant Maggie Pernia testified at the October suppression hearing that she was present on February 24, 2003 at the bureau, that she saw defendant that day, but did not talk to him or make any statements to him, that she walked in while defendant was confessing, and that she was never in the room alone with defendant.
At the suppression hearing on December 17, 2003, defendant argued that the State failed to prove its burden beyond a reasonable doubt on the Motion to Suppress, and that the second and third statements were not voluntarily given because defendant was deprived of sleep and intoxicated and, therefore, not in the state of mind where he could understand questions and give answers. He further argued that something must have occurred to cause defendant to deny everything in his first statement and then to confess a few hours later. He also contended that defendant should have been given his Miranda rights by the officer who picked him up, that the officer should have told defendant he did not have to go with him, and that defendant believed he had to go with the officer.
After hearing the arguments of counsel, the trial court denied the Motion to Suppress statements without providing reasons.
At trial, defendant testified that the first statement was true, but that the second and third statements were not. He explained that after the first statement, he got back to the jail at approximately 2:00 a.m. and did not have time to rest because they kept moving him from cell to cell. Defendant testified that Detective Spera picked him up from the jail at approximately 9:15 a.m. the next morning and brought him back to the station.
Defendant maintained that in the preinterview he told them nothing happened with A.L. He stated that Lieutenant Pernia then stopped him, told Detective Spera something, and that Detective Spera walked out of the room. Defendant claimed that Lieutenant Pernia told him he was guilty, that she had DNA evidence, and that if he did not give her a statement she would see to it that he got "the needle", which he thought meant death. He testified that at that point he was scared. He alleged that Lieutenant Pernia asked him if he was a predator or a sick predator, and he said he was neither.
Defendant asserted that Lieutenant Pernia told him that if he gave her a statement she would "get the D.A." because he was a good friend of hers. Defendant testified that Detective Spera then came back into the room and asked if he was ready to continue the statement. He said that Detective Spera pulled out a tablet with some notes on it and asked him if he and A.L. had sex in his room. Defendant testified that he said he did not, but that the detective told him to say he had, so defendant told them what they wanted to hear. Defendant explained that he did so because he thought his life was on the line and that it would not be if he gave a statement. Defendant further testified that he thought the evidence would prove him innocent.
At a hearing on a Motion to Suppress the statement or confession, the State bears the burden of proving beyond *475 a reasonable doubt the free and voluntary nature of the confession.[8] Before the prosecutor may introduce the statement or confession into evidence, he must show that it did not result from fear, duress, intimidation, menace, threats, inducements, or promises.[9] A statement obtained by direct or implied promises, or by the exertion of improper influence must be considered involuntary, and thus, inadmissible.[10] If the accused is in custody at the time he makes the statement, he must have been advised of his constitutional rights.[11]
The determination of whether a waiver of constitutional rights is knowing and voluntary is made on a case-by-case basis, and that determination rests upon the "totality of the circumstances."[12] The admissibility of a statement or confession is a determination for the trial judge and his conclusions regarding credibility and weight of the testimony concerning its voluntary nature will not be overturned unless unsupported by the evidence.[13] In reviewing a trial court's ruling on a Motion to Suppress, the appellate court may consider the evidence adduced at the motion hearing, as well as evidence at trial.[14]
In the instant case, the officers testified at the suppression hearing and at trial that defendant waived his rights and agreed to give the statements, and that they did not coerce or threaten defendant or promise him anything in order to get the statements. No evidence other than defendant's testimony was presented at the suppression hearing that defendant was sleep deprived, intimidated, threatened with death, or told what to say in his statements. The trial judge who presided over the suppression hearing obviously found the officers to be credible. The credibility of witnesses at a suppression hearing is within the discretion of the trier of fact, who may accept, in whole or in part, the testimony of any witness, and such credibility determinations will not be reweighed on appeal.[15] In light of the foregoing, we find that the trial court did not abuse its broad discretion in denying defendant's Motion to Suppress.

ASSIGNMENT OF ERROR NUMBER TWO
Defendant argues that his Motion to Sever the rape counts should have been granted. He contends that the jury was unfairly prejudiced by the number of charged offenses, and as a result, inferred *476 a criminal disposition. He further contends that cases were not distinctively similar. He also alleges that the trial of the two counts together was confusing to the jury.
The State responds that the offenses were properly joined in accordance with LSA-C.Cr.P. art. 493, in that they were of extremely similar character and constituted parts of a common scheme or plan, and that they were both triable by the same mode of trial, i.e., a jury. It further responds that there was no jury confusion, as the evidence for each count was presented separately, in an orderly fashion, and with clarity, and the offenses, although similar, were easily distinguishable from one another. The State also noted that the jury was provided with separate verdict sheets for each count.
On December 10, 2003, the trial judge ordered the severance of the molestation counts from the rape counts because they were not triable by the same mode of trial.[16]
On December 17, 2003, defendant stated at the hearing on the Motion to Sever the rape counts that he had filed his motion based on LSA-C.Cr.P. art. 495.1 and State v. Washington, 386 So.2d 1368 (La.1980), a Louisiana Supreme Court case that set forth grounds for a severance. Defendant argued that the facts in the instant case met those grounds in that the alleged incidents occurred, in one instance, 13 years apart in 1986 and 2002. He contended that the time between those two dates was so great that there could not be any pattern or intent.
The trial judge responded that these incidents were alleged to have been ongoing over many years. Defense counsel said that was true, but that there was a cutoff point when the incidents stopped. The trial judge asked whether these incidents would be separately potentially admissible under LSA-C.E. art. 404B, and defense counsel said "no" because there was no basis to bring them in, since they did not show a pattern. The trial judge noted again that the allegation was not of isolated incidents, but a course of conduct. Defense counsel denied that, saying that one set of charges claimed a course of conduct, but the other claimed two incidents.
Defense counsel added that the offenses were improperly joined, and that the case law was clear that if trying the offenses together would cause the jury to be hostile or prejudiced, that the probative value must be weighed against the prejudicial effect. He contended that nothing in the indictment showed any pattern or similarity, which was required before a court could deny a Motion to Sever. Defense counsel argued that under LSA-C.Cr.P. art. 495.1 and Washington, supra, there was a general presumption that cases should be severed, and that, in this case, nothing overcame that presumption. He further argued that the jury would conclude that if defendant was charged with the second offense he must be guilty of the first one, which would prejudice defendant and prevent him from having a fair trial.
The State responded that the offenses were similar, in that both victims were girls who were very young when defendant's sexual advances and sexual assaults started; that the second victim was molested and raped starting at age six and that the first victim was molested starting at age eight; that both victims had a familial relationship with defendant, in that *477 defendant was married to the mother of one victim and married to the sister of another victim; that defendant was not related to either victim by blood; that defendant lived in the home with both victims at different times; that defendant was seen as an authority figure in both instances; that defendant started out touching each child, which eventually escalated into rape; that defendant would use the domicile, especially the bedroom, to perform these acts; and that defendant would coerce both victims into not telling anyone with trips to fast food restaurants, candy, soda, affection, and attention. The State argued that although it was prejudicial to join the offenses, it was not improper, because there was a pattern and proof of lack of mistake or absence of knowledge.
Defendant responded that, even if the offenses were of the same or similar character, it was not enough to prevent the cases from being severed.
After hearing arguments of counsel, the trial judge denied the motion, stating:
Thank you. Having heard a great deal of testimony in this case, and being very familiar with both 404B and severance law, I find that in this case these were two series of rapes which involved very young females who had some sort of familial connection to the defendant; that the factual pattern, the scenario of where, when, how it occurred is similar; the way the defendant interacted with the alleged victims after, or the way the defendant is alleged to have interacted with the victims is similar; and I find that in this case the motion to sever therefore is denied.
LSA-C.Cr.P. art. 493 permits the joinder of offenses if the offenses charged "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan," provided the offenses are triable by the same mode of trial.
Defendant was charged with the aggravated rape of two juveniles, A.L. and B.B.[17] The indictment alleged that defendant committed aggravated rape of one of the victims (date of birth, December 8, 1990) on or between December 8, 1998 and December 7, 2002, and aggravated rape of the other victim (date of birth, February 17, 1980) on or between February 17, 1986 and February 16, 1992.[18] Although the two series of rapes occurred with different victims on different dates, they were very similar, as pointed out by the State, in that both victims were very young when defendant began sexually abusing them, both victims had a familial relationship with defendant, defendant was an authority figure to both victims in that he was the stepfather to one and once married to the sister of the other one, both series of rapes took place in the home, and in both cases defendant started out touching the victims, which eventually escalated into rape. Also, both counts were triable by the same mode of trial. Consequently, the counts were of the same or similar character as contemplated by LSA-C.Cr.P. art. 493 and were, therefore, properly charged in the same indictment.
A defendant properly charged in the same indictment with two or more offenses pursuant to LSA-C.Cr.P. art. 493 may nevertheless move for a severance of the offenses under LSA-C.Cr.P. art. 495.1. *478 which states: "If it appears that a defendant or the State is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires."
In determining whether prejudice may result from the joinder, the court should consider whether the jury would be confused by the various counts; whether the jury would be able to segregate the various charges and evidence; whether the defendant could be confounded in presenting his various defenses; whether the crimes charged would be used by the jury to infer a criminal disposition and finally, whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Washington, 386 So.2d 1368, 1371 (La.1980).
The defendant has a heavy burden of proof when he alleges prejudicial joinder. Id. A Motion to Sever under LSA-C.Cr.P. art. 495.1 is addressed to the sound discretion of the trial court and the ruling should not be disturbed on appeal absent a showing of an abuse of discretion. State v. Celestine, 452 So.2d 676, 680 (La.1984).
In the instant case, this Court finds that the two offenses shared enough similarities to make joinder permissible, yet the facts of each offense are not identical and are easily distinguishable from each other. The evidence against defendant on each count was not complex, and was presented in an orderly fashion, which allowed the jury to segregate the charges and evidence. As such, there was little likelihood that the jury was confused by the State's presenting evidence of the crimes together in one trial.
Additionally, the record shows the jury was provided with separate verdict sheets for each count with the victim's name on it.[19] Finally, there is no evidence the jury was hostile toward defendant because of the joinder of the offenses.[20]
Considering the similarity of the offenses, the simplicity of the facts of the offenses, the orderly presentation of evidence, and the positive identification of the defendant as the perpetrator by both victims, it is unlikely the jury was confused by the joinder or that defendant was prejudiced. Further, there is no evidence that the joinder of the offenses hindered defendant's right to present his defense. Therefore, we conclude that the trial court did not err in denying the severance of the two counts of rape.

ASSIGNMENT OF ERROR NUMBER THREE
Defendant argues that his consecutive sentences were constitutionally excessive. However, this Court does not reach this Assignment of Error, as noted above, due to the need to remand this matter to the trial court for disposition of the Motion for New Trial.[21]
*479 Accordingly, defendant's convictions are conditionally affirmed. The sentences are vacated, and the matter is remanded for disposition of the Motion for New Trial, and for resentencing.
CONVICTION CONDITIONALLY AFFIRMED; SENTENCES VACATED; MATTER REMANDED.
NOTES
[1] In accordance with LSA-R.S. 46:1844, the victim will be referred to by the use of initials in order to protect her identity. State v. Myles, 04-677 (La.App. 5 Cir. 1/25/05), 894 So.2d 515, 528.
[2] Defendant gave his first statement on February 24, 2003 at 12:50 a.m. to Sergeant Terry Graffeo, which is summarized below.
[3] It is noted that this form was not introduced into evidence either at the suppression hearing or at trial.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] Sergeant Graffeo's testimony at trial was very similar to his testimony at the suppression hearing.
[6] Detective Spera identified State's Exhibit 1 as a copy of that form; however, it was not introduced into evidence either at the suppression hearing or at trial.
[7] Detective Spera's testimony at trial was very similar to his testimony at the suppression hearing.
[8] LSA-C.Cr.P. art. 703; State v. Hills, 354 So.2d 186, 188 (1977); State v. McGee, 04-963, p. 11 (La.App. 5 Cir. 1/11/05), 894 So.2d 398, 407, writ denied, 05-0593 (La.5/20/05), 902 So.2d 1050.
[9] LSA-R.S. 15:451; State v. Lucky, 96-1687, p. 16 (La.4/13/99), 755 So.2d 845, 855, cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000); State v. McLelland, 03-498, pp. 5-6 (La.App. 5 Cir. 10/15/03), 860 So.2d 31, 35, writ denied, 03-3372 (La.3/26/04), 871 So.2d 347.
[10] State v. Jackson, 381 So.2d 485, 487 (La.1980); State v. McLelland, supra.
[11] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[12] State v. Fernandez, 96-2719, p. 7 (La.4/4/98), 712 So.2d 485, 487; State v. McGee, 04-963 at pp. 11-12, 894 So.2d at 407.
[13] State v. Thibodeaux, 98-1673, p. 12 (La.9/8/99), 750 So.2d 916, 922, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000).
[14] State v. Collins, 04-255, p. 6 (La.App. 5 Cir. 10/12/04), 886 So.2d 1149, 1154, writ denied, 04-2798 (La.3/11/05), 896 So.2d 62.
[15] State v. Calvert, 01-826, p. 7 (La.App. 5 Cir. 2/26/02), 811 So.2d 1081, 1084.
[16] The record does not reflect that a Motion to Sever was ever filed. This fact was noted by defendant in his brief. However, the record does reflect that, on July 8, 2003, the State filed an Answer to defendant's Motion to Sever.
[17] Defendant was also charged with two counts of molestation of a juvenile; however, those counts are not at issue here because the trial judge severed them from the rape counts.
[18] According to the verdict sheet, A.L's date of birth was December 8, 1990.
[19] See State v. Welch, 03-905 (La.App. 5 Cir. 11/25/03), 864 So.2d 204, 208, writ denied, XXXX-XXXX (La.2/4/05), 893 So.2d 88 (citation omitted) where the fact of separate verdict sheets containing the name of each victim was considered a factor in finding no error in the trial court's failure to sever for trial the various counts (four counts of first degree robbery and one count of armed robbery) against defendant.
[20] See State v. Evans, 03-0752 (La.App. 5 Cir. 12/9/03), 864 So.2d 682, 695, writ denied, XXXX-XXXX (La.5/7/04), 872 So.2d 1079 citing State v. Lee, 99-1404, pp. 9-10 (La.App. 4 Cir. 5/17/00), 764 So.2d 1122, 1128.
[21] Error Patent Discussion: The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920. The review reveals errors in this case at sentencing. Though today we vacate defendant's sentences and remand, we note the following for the trial court's information. Defendant was convicted under LSA-R.S. 14:42, a "sex offense" as defined by LSA-R.S. 15:541(14.1), but was not notified at sentencing of the sex offender registration requirements as mandated by LSA-R.S. 15:540 et seq. The trial court also failed to advise defendant of the two-year prescriptive period for applying for post-conviction relief under LSA-C.Cr.P.art. 930.8.