NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-1128 c/w 06-1140


STATE OF LOUISIANA

VERSUS

MICHAEL E. GORDON


**********

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. CR04-4753
HONORABLE PATRICIA C. COLE, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Elizabeth A. Pickett, and James T. Genovese, Judges.

**WRITS DENIED.**


**Cooks, J., dissents in part and assigns written reasons.**

**Douglas L. Hebert Jr.**
**District Attorney - 33rd JDC**
**Sherron Ashworth, A.D.A.**
**Joe Green, A.D.A.**
**P. O. Drawer 839**
**Oberlin, LA 70655**
**Counsel for Respondent:**
       **State of Louisiana**

**Kathrine Sara Williamson**
**Attorney At Law**
**P.O. Box 1470**
**Alexandria,, LA 71309**
**Counsel for Defendant/Applicant:**
       **Michael Gordon**

**James Michael Small**
**Attorney at Law**
**P. O. Box 1470**
**Alexandria, LA 71309**
**Counsel for Defendant/Applicant:**
       **Michael Gordon**

**Pickett, J.**

## FACTS

The Allen Parish grand jury indicted the defendant, Michael Gordon, charging him with nine separate offenses: (1) vehicular homicide, in violation of La.R.S. 14:32.1; (2) possession of a CDS I (marijuana), in violation of La.R.S. 40:966(C); (3) possession of a CDS III (boldenone), in violation of La.R.S. 40:968(C); (4) possession of a CDS III (nadrolone), in violation of La.R.S. 40:968(C); (5) possession of a CDS III (testosterone), in violation of La.R.S. 40:968(C); (6) possession of a CDS II (hydrocodone) with intent to distribute, in violation of La.R.S. 40:967(A)(1); (7) possession of a CDS IV (alprazolam) with intent to distribute, in violation of La.R.S. 40:969(A)(1); (8) possession of a CDS IV (diazepam), in violation of La.R.S. 40:969(C); and (9) possession of drug paraphernalia, in violation of La.R.S. 40:1033(C).

On January 21, 2005, the defendant filed a Motion to Quash Indictment and Incorporated Memorandum of Authorities, arguing improper joinder of charges, as well as a Motion to Suppress Evidence, seeking to suppress evidence related to the drug charges. The defendant, on March 30, 2005, also filed a Supplemental Motion to Suppress with Incorporated Memorandum of Authorities, seeking to suppress the chemical analysis of the defendant's blood. Several days later, the defendant filed with the district court a Motion for Disclosure of Exculpatory Grand Jury Testimony and Incorporated Memorandum of Authorities.

The trial court conducted a hearing on the defendant's motions on January 10, 2006. In response to the defendant's Motion to Quash, the district court granted the defendant partial relief, severing or bifurcating the two misdemeanors, counts two

1

and nine, from the felony charges, but denying the defendant's Motion to Quash insofar as it moved to quash or sever the vehicular homicide charge from the felony drug charges. In response to the defendant's Motion for Disclosure of Exculpatory Grand Jury Testimony, the district court ordered an *in camera* inspection of the grand jury testimony.

The trial court denied the defendant's Motion to Suppress Evidence, which sought to suppress the evidence found in the defendant's home, in the defendant's motor home, and outside the defendant's motor home. However, after conducting a hearing on January 10, 2006 and a second hearing on August 8, 2006, the district court granted the defendant's Supplemental Motion to Suppress and suppressed the blood toxicology reports.

On August 11, 2006, the defendant filed with the trial court a Supplemental Motion to Quash or Alternatively to Sever Counts based on the suppression of the blood toxicology reports. On the same date, the district court denied the motion without a hearing. Upon the defendant's notice of intent to seek supervisory review, the trial court fixed an August 31, 2006, return date. The defendant also requested a stay of proceedings pending the outcome of his writ application. The district court first denied, then later granted the stay of proceedings. On August 30, 2006, the defendant filed an application with this court seeking supervisory review of the trial court's denial of his Supplemental Motion to Quash. This court assigned docket number KW06-1128 to the defendant's writ application.

On August 23, 2006, the prosecution filed in the trial court both a notice of its intent to seek supervisory review of the district court's granting of Defendant's Supplemental Motion to Suppress and a stay request. The district court set an August

31, 2006 return date and granted the stay pending the outcome of the applications for supervisory review. On August 31, 2006, the prosecution filed its application seeking supervisory review of the suppression of the toxicology reports with this court. This writ application was assigned docket number KW06-1140. On September 19, 2006, the defendant responded to the state's writ application by filing an opposition brief with this court. We consolidated the two writs.

**KW06-1128:**      <u>**WRIT APPLICATION BY DEFENDANT.**</u>

<u>ASSIGNMENT OF ERROR</u>:

The trial court erred in refusing to quash the indictment or sever the substantive drug counts from the charge of vehicular homicide.

**KW06-1140:**      <u>**WRIT APPLICATION BY THE STATE.**</u>

<u>ASSIGNMENT OF ERROR</u>:

The trial court erred in granting Defendant's Motion to Suppress toxicology reports, thereby forbidding the introduction of those reports into evidence at trial and causing irreparable injury to the State.

<u>**KW06-1140:**</u>

The state argues that the trial court erred in suppressing toxicology reports and alleges that the ruling caused irreparable injury to the prosecution. The state contends that on the morning of the January 10, 2006 hearing, it that "[t]he actual standard rights form which includes those rights found under La.R.S. 32:661(C) for chemical testing, and which was used in this case, could not be located and could not be presented at the suppression hearing as evidence." So, instead of introducing the actual forms into evidence, the state presented witness testimony regarding the defendant's advisement and waiver of rights. The state complains that, although the district court indicated that the January 10, 2006 testimony would be considered with

3

the evidence taken at the August 8, 2006 hearing, the trial court's ruling appears to be limited to the evidence introduced at the August hearing.

The prosecution urges that the trial court's finding that there was no way of determining whether the defendant had been advised of an independent or additional test was not supported by the evidence, was contrary to the evidence presented, and constitutes an abuse of discretion.

TESTIMONY GIVEN AT THE HEARINGS:

At the January 10, 2006 hearing, the trial court heard evidence presented on the issue of whether the defendant's blood toxicology results should be suppressed. When the parties began to introduce evidence concerning the blood test, the district court interrupted the testimony, and the following conversation occurred on the record:

THE COURT:

Now, we are not taking up the Supplemental Motion to Suppress the result of the blood testing today.

MR. SMALL:

Yes, ma'am.

MR. DEMORUELLE:

Say again.

THE COURT:

That isn't one y'all mentioned so I set [it] aside. Are we taking up the Supplemental Motion to Suppress the results of the blood test today[?]

4

MR. DEMORUELLE:

Yes.

THE COURT:

All right.

Later, the trial court agreed to continue the hearing on the issue of the defendant's blood toxicology results and, in doing so, the district court stated, "All right. And whatever testimony was taken pursuant to that we will simply have that on the record."

Scotty LaBorde, who worked as an investigator with the Oakdale Police Department on September 2, 2004, participated in investigating the defendant's case. When Lieutenant LaBorde arrived on the scene, the motor home involved in the accident was completely in the public roadway with the engine still running, and a deceased woman was in the street some distance behind the vehicle.

Lieutenant LaBorde was aware that La.R.S. 32:666 is an implied consent statute under which the driver of a vehicle involved in a traffic fatality or serious bodily injury cannot refuse a blood test. So, shortly after arriving on the scene at 7:05 p.m., Lieutenant LaBorde instructed an officer to find the defendant and to transport him to the Oakdale Community Hospital to have blood drawn for testing. Lieutenant LaBorde expected Officer Virgil West to execute the standard chemical rights form prior to having the defendant's blood drawn. At that time, Lieutenant LaBorde did not have probable cause to believe that the defendant was under the influence of alcohol or controlled substances while he was operating the motor home involved in the accident.

5

At 9:10 p.m. that evening, Officer West reported to Lieutenant LaBorde that the defendant's blood had been drawn and seized. Officer West collected the blood sample and turned it over to Glenda Odom who is employed as an evidence officer by the Oakdale Police Department. According to Officer West's report, the standard chemical test rights for a DWI were read to the defendant. However, Lieutenant LaBorde did not recall seeing the actual form used. Upon questioning Officer West as to its whereabouts, Lieutenant LaBorde learned that the form could not be located. The forms were executed to prove that the defendant consented to the blood draw. Lieutenant LaBorde though that the form used would have been the standard DWI chemical testing form in use by the Oakdale Police Department at that time. Lieutenant LaBorde has seen that particular form many times. It listed several types of information, including the subject's right to have witnesses, the consequences of refusing to submit to the test, and the subject's right to have an independent examination.

Officer West, who currently works for the Allen Parish Sheriff's Office, also testified at the January 6, 2006 hearing. At the time of the incident, Officer West was employed as a patrol sergeant with the Oakdale Police Department. When Officer West arrived at the scene of the accident, Lieutenant LaBorde instructed him to locate the defendant, advise him of his rights, and accompany the defendant to the hospital for a blood draw. Officer West found the defendant at the police station, and Trooper Roy Dean Strother transported the defendant to the emergency room at the Oakdale Community Hospital. Officer West followed in his unit. When Officer West arrived at the hospital, Trooper Strother was reading the blood test form to the defendant. While they were waiting for the nurse, Officer West also read the defendant "the

6

rights off the DWI rights sheet relating to the chemical test." The nurse then drew the defendant's blood. Officer West took the vials back to the police station where he turned them over to the evidence officer, Glenda Odom.

Officer West read the DWI form being used in the Oakdale Police Department at that time and for some time prior to the accident. The form was not a consent form. It was a DWI rights form with the *Miranda* rights, the chemical test rights, the consequences of refusing to take the test, and the consequences of failing the test. The form also listed a number of things set out in Title 32 regarding chemical testing: explanations that blood will be drawn, that the defendant had the right to independent testing of the blood, that there are ordinarily consequences to refusing a blood test, and that, as a case involving a fatality, the defendant did not have the option of refusing the blood analysis.

Although Officer West did not always keep a copy of the form with him, he had picked up a copy while he was at the police station looking for the defendant. Officer West did not recall exactly what happened to the form used in the instant case, but though that he may have given it to one of the three or four investigators present at the police station that night. Lieutenant LaBorde was the most likely candidate. Prior to the hearing, when Officer West was checking to see which officer had signed the form, Lieutenant LaBorde told Officer West that he did not have the form.

The trial court heard additional evidence on the Supplemental Motion to Suppress the blood toxicology test results on August 8, 2006. Charlotte Eschetté, who is a registered nurse with the Oakdale Community Hospital emergency room, was the person who drew the defendant's blood on the evening of September 2, 2004.

7

Trooper Strother and Officer West were with the defendant when she drew the blood. The blood draw took awhile because she had to wait for the state police to bring the collection vials. Nurse Eschetté waited for the officers to read the defendant his rights for chemical testing related to the blood draw before performing the draw. The reading of the rights took awhile because the chemical testing rights are lengthy in comparison to the *Miranda* rights. Nurse Eschetté did not recall whether the defendant signed the rights form while he was in her presence. The defendant did not attempt to refuse the blood draw.

Officer West testified again at the second hearing. On September 2, 2004, Officer West accompanied Trooper Strother and the defendant to the hospital, read defendant his rights pertaining to the chemical test prior to the blood draw, seized the blood at the hospital emergency room, brought the sample back to the police station, and turned it over to the police evidence officer. The defendant's case was the first time Officer West had been responsible for a blood draw.

The Oakdale Police Department used a rights form in connection with the consent to draw blood for chemical analysis, which form Officer West read to the defendant on September 2, 2004. The form has an area where a subject can sign to indicate consent. Officer West did not know where the form was on the date of the hearing, but he probably would have given the form to Lieutenant LaBorde. Officer West did not recall whether the defendant had signed the form; but under the law at the time, the defendant did not have to consent because the test was mandatory due to the fatality. Lieutenant LaBorde did not mention probable cause but told Officer West that the defendant could not refuse the test.

8

Officer West though that the defendant signed the form, but he could not recall specifically. Officer West also did not remember signing that specific form, but he was sure he signed the form because, as a habit, he signs every rights form that he reads. Both Trooper Strother and Nurse Eschetté were present when Officer West read the form. Officer West had not attempted to locate the form since the January hearing because he did not know where it could be found if it was not in the case investigation file. Since Officer West no longer works with the Oakdale Police Department, he would not be aware of any additional efforts made to locate the rights form.

Although Officer West did not specifically recall informing the defendant of the rights and consequences mentioned in the defense attorney's questions, each of the rights and consequences were on the DWI/chemical test rights form that Officer West read to the defendant on September 2, 2004. Refusal would result in a fine up to $1,000.00 and imprisonment up to six months. Refusal would constitute a violation of La.R.S. 14:98.2. Refusal would result in revocation of the defendant's driver's license. A positive test would result in suspension of driving privileges. The defendant had the right to request an additional test independently performed by a qualified person of his choosing. The defendant indicated that he understood his rights and did not refuse consent to the test.

Glenda Odom, the records clerk and evidence officer for the Oakdale Police Department, worked part-time as the assistant to the evidence officer on September 2, 2004. She received two vials of blood from Officer West at 9:44 p.m. on September 2, 2004. Officer Odom listed the evidence in the log book and locked the evidence in the refrigerator in the evidence office. The blood remained in the

refrigerator until September 29, 2004, when Officer Odom and Ron Craiger took the vials to the state crime lab in Baton Rouge.

Blake Stutzman, who works as a forensic scientist at the Louisiana State Police Crime Lab, tested the defendant's blood and issued a report on the analysis. The evidence was sealed by the Oakdale Police Department; and after the analysis was completed, Mr. Stutzman resealed the evidence and initialed the container and the tape. Each person who opened the container would have resealed and initialed it. Mr. Stutzman tested the blood twice and determined that it contained methadone, diazepam, hydrocodone, and nordiazepam.

THE RULING:

In issuing its ruling, the trial court found that there was no problem with the lack of evidence concerning the expiration date of the blood kit. The district court stated that it had no idea what was on the rights form read to the defendant. The trial court held that there was no evidence presented as to whether the La.R.S. 32:661 rights were included in the rights form. The district court stated that Lieutenant LaBorde had specifically testified that he did not have probable cause to believe that the defendant had been operating the vehicle under the influence of alcohol or controlled dangerous substances. The trial court observed that the state failed to introduce a copy of the standard form into evidence.

The district court found that, without a form, there was no evidence introduced to show whether the defendant had been advised that an independent test could be performed under La.R.S. 32:664(B). The trial court acknowledged that Officer West had testified that, even though he could not specifically remember informing the defendant of the right, it had been on the rights form he read. The district court held

10

that Officer West's repeated failure to specifically recall telling the defendant about the rights found in La.R.S. 32:661(C)(1) was vital. The trial court pointed out that it did not know what rights were on the form because the witness was not asked about whether each right was on the form and was not shown a duplicate form. The district court found that the failure to present evidence regarding La.R.S. 32:661(A)(2)(a), which mandates officers to have reasonable cause for administering such a test, was fatal.

Ultimately, the trial court suppressed the blood test results based on insufficient proof concerning "due process and [the] constitutional rights read to [Defendant]."

DISCUSSION:

The prosecution argues that, based on the evidence presented at the hearings, the trial court erred in finding insufficient proof that the rights were read to the defendant. The state asserts that La.R.S. 32:661(C) is the only provision in Title 32 relating to chemical testing rights and that La.R.S. 32:666 mandates the chemical test based on the involvement of a fatality. The prosecution contends that due process was preserved because the defendant was read his rights and because the state submitted sufficient evidence to prove that the defendant waived his *Miranda* rights, was read his Title 32 chemical test rights, and consented to the chemical test.

The defendant responds that there was no error in the trial court's ruling and that the district court correctly suppressed the blood analysis because the state failed to prove that it advised the defendant of his rights prior to seizing his blood. The defendant also argues that the district court properly suppressed the blood analysis based on several additional factors on which the trial court did not base its judgment. We will not address these arguments as they are not responsive to the issue presented

11

in the state's writ application. The defendant should not be able to attack the trial court's reasons for ruling in an opposition brief when he did not file an application for supervisory review challenging the basis of the district court's ruling.

The supreme court has held that a trial court's finding of fact or determination of credibility made pertaining to a motion to suppress is reviewed for manifest error and that a district court's determination of law is subject to *de novo* review. *State ex rel. Thibodeaux v. State*, 01-2510 (La. 3/8/02), 811 So.2d 875. This court has previously discussed the applicable standard for reviewing district court rulings on motions to suppress when the issue involves mixed questions of facts and law:

> The appellate court looks at the totality of the evidence presented at the hearing for the motion to suppress when reviewing a trial court's denial of the motion. *State v. Sherman*, 03-1198 (La.App. 3 Cir. 3/2/05), 896 So.2d 1194. The appellate court should overturn the trial court's conclusions only if they are not supported by the evidence or there is a clear abuse of discretion. *State v. Purvis*, 96-787 (La.App. 3 Cir. 12/11/96), 684 So.2d 567. "In other words, the appellate court will give the trial court's determination great weight and will not set aside the trial court's ruling unless clearly mandated by a preponderance of the evidence." *Sherman*, 896 So.2d at 1202.

*State v. Moreau*, 05-544, pp. 3-4 (La.App. 3 Cir. 12/30/05), 918 So.2d 598, 601. The state bears the burden of proving the admissibility of evidence seized without a warrant. La.Code Crim.P. art. 703(D).

Title 32 of the Louisiana Revised Statutes states that, by driving on the public highways, drivers consent to chemical testing for intoxication and that the driver must be informed of certain rights prior to submitting to the chemical testing:

> A. (1) Any person, regardless of age, who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent, subject to the provisions of R.S. 32:662, to a chemical test or tests of his blood, breath, urine, or other bodily substance for the purpose of determining the alcoholic content of his blood, and the presence of any abused substance or controlled dangerous substance as

12

set forth in R.S. 40:964 in his blood if arrested for any offense arising out of acts alleged to have been committed while the person was driving or in actual physical control of a motor vehicle while believed to be under the influence of alcoholic beverages or any abused substance or controlled dangerous substance as set forth in R.S. 40:964.

(2)(a) The test or tests shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person, regardless of age, to have been driving or in actual physical control of a motor vehicle upon the public highways of this state while under the influence of either alcoholic beverages or any abused substance or controlled dangerous substance as set forth in R.S. 40:964. The law enforcement agency by which such officer is employed shall designate in writing and under what conditions which of the aforesaid tests shall be administered.

. . . .

C. (1) When a law enforcement officer requests that a person submit to a chemical test as provided for above, he shall first read to the person a standardized form approved by the Department of Public Safety and Corrections. The department is authorized to use such language in the form as it, in its sole discretion, deems proper, provided that the form does inform the person of the following:

(a) His constitutional rights under Miranda v. Arizona.

(b) That his driving privileges can be suspended for refusing to submit to the chemical test.

(c) That his driving privileges can be suspended if he submits to the chemical test and such test results show a blood alcohol level of 0.08 percent or above or, if he is under the age of twenty-one years, a blood alcohol level of 0.02 percent or above.

(d) That his driving privileges can be suspended if he submits to the chemical test and the test results show a positive reading indicating the presence of any controlled dangerous substance listed in R.S. 40:964.

(e) The name and employing agency of all law enforcement officers involved in the stop, detention, investigation, or arrest of the person.

(f) That refusal to submit to a chemical test after an arrest for an offense of driving while intoxicated if he has refused to submit to such test on two previous and separate occasions of any previous such violation is a crime under the provisions of R.S. 14:98.2 and the

13

penalties for such crime are the same as the penalties for first conviction of driving while intoxicated.

   (2) In addition, the arresting officer shall, after reading said form, request the arrested person to sign the form. If the person is unable or unwilling to sign, the officer shall certify that the arrestee was advised of the information contained in the form and that the person was unable to sign or refused to sign.

La.R.S. 32:661. Thus, under La.R.S. 32:661(A), an officer must have reasonable grounds to believe a driver is intoxicated before that officer can order a chemical test. As stated by the trial court, the prosecution failed to establish that reasonable grounds existed to believe that the defendant had been driving under the influence of an intoxicating substance. So, the test was improper under La.R.S. 32:661.

In cases where there is both a fatality and probable cause to believe that a driver was intoxicated, the driver cannot refuse to submit to chemical testing:

   A. (1)(a)(I) When a law enforcement officer has probable cause to believe that a person has violated R.S. 14:98, R.S. 14:98.1, or any other law or ordinance that prohibits operating a vehicle while intoxicated, that person may not refuse to submit to a chemical test if . . . a fatality has occurred . . . in a crash involving a motor vehicle, aircraft, watercraft, vessel, or other means of conveyance. . . . The law enforcement officer shall direct that a chemical test be conducted of a person's blood, urine, or other bodily substance, or perform a chemical test of such person's breath, for the purpose of determining the alcoholic content of his blood and the presence of any abused substance or controlled substance as set forth in R.S. 40:964 in his blood in such circumstances. A physician, registered nurse, qualified technician, or chemist shall perform a chemical test in accordance with the provisions of R.S. 32:664 when directed to do so by a law enforcement officer.

La.R.S. 32:666(A). However, this statute also does not apply to the current case because the officer ordering the chemical analysis specifically testified that he did not have probable cause to believe that the defendant was under the influence of drugs or alcohol at the time of the accident.

14

In *State v. Clark*, 446 So.2d 293 (La.1984), Clark challenged the admissibility of his blood alcohol tests because the officer responsible for supervising the blood extraction failed to have him sign a standard form after informing Clark of his rights. The supreme court explained that Clark had been orally advised of the rights and consequences included in the standard "rights form," that Clark had consented to the blood draw, that he had signed a "consent form," that Clark had subsequently received a "rights form" in conjunction with another blood alcohol test, and that the test complied with statutory requirements. *Id*. at 297. Under those circumstances, the supreme court declined to exclude the blood analysis because Clark did not sign a "rights form." *Id*.

In *State v. Alcazar*, 00-536 (La. 5/15/01), 784 So.2d 1276, the supreme court found that Alcazar's blood alcohol analysis should be suppressed because the officer administering an Intoxilyzer 5000 exam to Alcazar failed to advise him of his rights under La.R.S. 32:661(C)(1) prior to the test. The supreme court held that the subsequent explanation of rights was insufficient to cure the violation of Alcazar's statutory right, and an opportunity to refuse the test after its administration would likewise not cure the violation. The supreme court determined that exclusion of the test results, even if not mandated by the statute, was the only means of insuring compliance with La.R.S. 32:661(C) and La.R.S. 32:666.

In *State v. Coleman*, 517 So.2d 1061 (La.App. 3 Cir. 1987), this court reversed Coleman's conviction because the officer who administered a photoelectric intoximeter test to Coleman failed to first advise Coleman of the consequences of registering with an alcohol content more than .10 percent. At the time of Coleman's arrest, La.R.S. 14:98(A)(2) established "an irrebuttable presumption of intoxication

15

if the blood alcohol level is .10 percent or more." *Id*. at 1063. This court held that "[t]he only means to assure compliance with the express requirements of the statute [La.R.S. 32:661(C)] is to exclude test results, whether or not the statute expressly mandates such exclusion." *Id*.

At various points in the testimony, the state presented evidence showing that Officer West had read the defendant the standard rights form which contained the following information: the right to have witnesses, the *Miranda* rights, the right to have an independent test performed, the consequences of refusing to submit to the test, and the consequences of failing the test. Thus, according to the testimony presented at both hearings, the name and employing agency of all law enforcement officers involved in the stop, detention, investigation, and arrest was the only information required by La.R.S. 32:661(C)(1) that Officer West did not read to the defendant.

The prosecution does not object to or seek review of the trial court's finding that the state's failure to establish reasonable grounds for believing the defendant to have been intoxicated while driving the vehicle was fatal to the admissibility of the blood analysis. Review of the evidence submitted at both hearings shows that Lieutenant LaBorde ordered the blood test solely on the basis that there was a fatality involved in the accident and that Officer West administered the test strictly in response to Lieutenant LaBorde's orders.

Thus, there is no merit in this assignment of error because the prosecution failed to establish either reasonable grounds or probable cause to believe that the defendant had been operating the motor home under the influence of an intoxicating substance.

16

This assignment of error is without merit.  The writ is, therefore, denied.

**KW06-1128:**

The defendant contends that the trial court erred in refusing to quash the indictment or sever the felony drug counts from the charge of vehicular homicide. The defendant argues that, because the district court has excluded all toxicology results pertinent for prosecuting the defendant for vehicular homicide, the landscape of the case has changed, and the joint prosecution of the vehicular homicide charge and the drug offenses is no longer proper.  The defendant asks this court to either quash the indictment or sever the vehicular homicide charge from the felony drug offenses, to reverse the trial court's ruling, and to remand the matter for further proceedings in accordance with law.

The defendant's Supplemental Motion to Quash or Alternatively to Sever Counts  also argues that the indictment should be quashed or the vehicular homicide charge should be severed from the felony drug charges because they were not part of the same act or transaction and did not constitute a common scheme or plan.  The defendant points out that his blood toxicology is not admissible into evidence.  The defendant further alleges that the state no longer has any admissible evidence concerning the chemicals found in the defendant's blood or the defendant's ingestion of the controlled substances.  The defendant contends that, as the case no longer involves alleged use of alcohol or illegal substances, the state has no competent evidence to prove that the defendant was under the influence because evidence of drug possession would not be admissible to prove that the defendant was under the influence of drugs.

17

Thus, the defendant is basically alleging that the state no longer has sufficient evidence to prove that he committed vehicular homicide and that the indictment should be quashed or the vehicular homicide charge severed based on insufficient evidence. The supreme court has maintained that a motion to quash is an inappropriate mode for raising a defense on the merits of the state's case:

> In considering a motion to quash, a court must accept as true the facts contained in the bill of information and in the bills of particulars, and determine as a matter of law and from the face of the pleadings, whether a crime has been charged. While evidence may be adduced, such may not include a defense on the merits. The question of factual guilt or innocence of the offense charged is not raised by the motion to quash.
>
> The only issue before the court of appeal [is] whether the trial court ruled correctly on the motion to quash.

*State v. Perez*, 464 So.2d 737, 739-40 (La.1985) (citations omitted); *see also*, *State v. Corbett*, 04-1124, (La. 11/15/04), 888 So.2d 764 (quoting *State v. Byrd*, 96-2302, (La. 3/13/98), 708 So.2d 401, *cert. denied*, 525 U.S. 876, 119 S.Ct. 179 (1998)).

Likewise, this court has held that questions of fact are to be left to factfinder and are not to be decided in a motion to quash:

> A motion to quash is a mechanism by which a defendant raises pretrial pleas or defenses which do not go to the merits of the criminal charge. *State v. Rembert*, 312 So.2d 282 (La.1975). The motion to quash concerns a defense which, if successful, requires dismissal of the indictment or information regardless of the issue of the defendant's guilt or innocence. *State v. Reaves,* 376 So.2d 136 (La.1979). Questions of law such as the sufficiency of the indictment, constitutionality of a statute or governmental misconduct are issues to be decided by a judge pursuant to a motion to quash. On the other hand, questions of fact are issues decided by the jury; for example, guilt or innocence, sanity at the time of the offense, self-defense, entrapment or intoxication. *State v. Caldwell*, 616 So.2d 713, 721 (La.App. 3 Cir.1993).

*State v. Ray*, 98-664, p. 3 (La.App. 3 Cir. 10/28/98), 721 So.2d 974, 976. Therefore, the defendant's challenge to the sufficiency of the state's case is not properly reviewed in a motion to quash the indictment.

We will now examine whether the joinder of the charges was proper under the joinder rules set forth in La.Const. art. 1, § 17 and La.Code Crim.P. art. 490, *et seq*. "The trial court is vested with much discretion in determining whether to grant a motion to sever, and its ruling should be upheld in the absence of an abuse of this discretion." *State v. Simmons*, 02-253, pp. 7-8 (La.App. 4 Cir. 5/14/03), 848 So.2d 58, 64, *writ denied*, 03-1718 (La. 5/14/04), 872 So.2d 508; *see also, State v. Williams*, 05-317 (La.App. 5 Cir. 11/29/05), 918 So.2d 466, *writ denied*, 06-638 (La. 10/6/06), 938 So.2d 64; *State v. Wade*, 39,797 (La.App. 2 Cir. 8/9/05), 908 So.2d 1220, *writ denied*, 06-109, 06-148 (La. 6/2/06), 929 So.2d 1251.

Under certain circumstances, multiple offenses may be charged in the same indictment or bill of information:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.

La.Code Crim.P. art. 493; *see also*, La.Const. art. 1, § 17. Additionally, absolute and relative felonies may by joined, in spite of having different modes of trial, if they (1) are of the same character, (2) are based on the same act or transaction, (3) are based on multiple connected acts or transactions, or (4) constitute parts of a common scheme or plan. La.Const. art. 1, § 17; La.Code Crim.P. art. 493.2. A defendant may

19

object to misjoinder of offenses by filing a motion to quash the indictment. La.Code Crim.P. art. 495.

Under La.Code Crim.P. art 779, misdemeanors involving a potential fine in excess of a thousand dollars or potential imprisonment exceeding six months shall be tried by a six-person jury. All jurors must concur to render a verdict. All other misdemeanors are tried by bench trial. La.Code Crim.P. art. 779. Under La.Const. art. 1, § 17 and La.Code Crim.P. art. 782, offenses for which the penalty may involve a hard labor sentence are also to be tried by a six-person jury. All jurors must concur to render a verdict. Death penalty cases and absolute felonies must be tried by a twelve-person jury. La.Const. art. 1, § 17; La.Code Crim.P. art. 782. All twelve jurors must concur to render a verdict in a capital case, but only ten of the twelve jurors must concur to render a verdict in an absolute felony case. La.Const. art. 1, § 17; La.Code Crim.P. art. 782.

The seven charges currently remaining on the bill of indictment include five relative felonies. The penalty for committing vehicular homicide, count one, includes a fine ranging from $2,000.00 to $15,000.00 and imprisonment ,with or without hard labor, from two to twenty years. La.R.S. 14:32.1. As a relative felony, vehicular homicide offenses are tried by a six-person jury. La.Const. art. 1, § 17; La.Code Crim.P. art. 782. The penalty for possessing boldenone, nadrolone, and testosterone without a prescription, counts three, four, and five, is imprisonment for up to five years, with or without hard labor, and an optional fine not to exceed $5,000.00. Therefore, the charges for possession of boldenone, nadrolone, and testosterone require six-person juries. La.Const. art. 1, § 17; La.R.S. 40:968(C); La.Code Crim.P. art. 782. The penalty for possessing diazepam, count eight, is a sentence, with or

20

without hard labor, of up to five years and an optional fine up to $5,000.00. La.R.S. 40:969(C). As a relative felony, possession of diazepam is also triable by a six-person jury. La.Const. art. 1, § 17; La.Code Crim.P. art. 782.

The two other charges remaining on the bill of indictment are absolute felonies. The penalty for possessing hydrocodone with intent to distribute, count six, is a mandatory hard labor sentence ranging from two to thirty years and an optional fine up to fifty thousand dollars. La.R.S. 40:967(A)(1). The penalty for possessing alprazolam with intent to distribute, count seven, is a hard labor sentence of up to ten years and an optional fine up to $15,000.00. La.R.S. 40:969(A)(1). As absolute felonies, charges for both possession of hydrocodone with intent to distribute and possession of alprazolam with intent to distribute must be tried by a twelve-person jury. La.Const. art. 1, § 17; La.Code Crim.P. art. 782. As all of the current charges on the bill of indictment are either relative or absolute felonies, the charges may be joined if they satisfy the requirements of La.Const. art. 1, § 17 and La.Code Crim.P. art. 493.2.

Although the district court issued oral reasons for refusing to sever the vehicular homicide charge in ruling on the defendant's first motion to quash, the trial court denied the defendant's Supplemental Motion to Quash or Alternatively to Sever Counts without issuing reasons. We look to the trial court's original reasons for ruling as a guideline for its second denial as it is unlikely that the district court altered its initial findings in the second ruling. In response to the first motion to quash, the district court found that vehicular homicide was not of the same or similar character as the drug offenses; instead, the charges were based on the same act or transaction.

21

In *State v. Carter*, 362 So.2d 510 (La.1978), the supreme court found that three types of offenses were properly joined in one indictment: aggravated rape, aggravated crime against nature, and aggravated burglary. All of the offenses occurred within a one-hour time frame at the same location. The supreme court concluded that Carter had not been prejudiced because the trier of fact could have compartmentalized the evidence and intelligently applied the law as to each offense. *Id.*

In *Simmons*, 848 So.2d 58, the defendant had been charged in one bill of information with attempted simple burglary, attempted burglary of an inhabited dwelling, aggravated burglary of an inhabited dwelling, false imprisonment while armed with a dangerous weapon, sexual battery, and possession of cocaine. The jury found Simmons guilty of aggravated burglary of an inhabited dwelling, false imprisonment while armed with a dangerous weapon, sexual battery, and possession of cocaine.

All of the offenses except possession of cocaine arose from Simmons breaking into a house in the early hours of January 27, 2001. After reporting the incident to the police, the victims identified Simmons as the perpetrator from a photographic line-up. The investigating officers obtained an arrest warrant; and later that evening, the officers arrested Simmons. When conducting the search incident to Simmons' arrest, the officers found three rocks of crack cocaine. The fourth circuit vacated Simmons' conviction for possession of cocaine, concluding that the discovery of the cocaine, which occurred more than eighteen hours after the burglary, was not sufficiently connected to the earlier events even though the purpose of the burglary may have been to obtain funds to purchase the cocaine.

22

The defendant has not provided this court with a bill of particulars to review or a statement that there has been open file discovery. The indictment alleges that all of the offenses took place in Allen Parish on or about September 2, 2004. Because the defendant did not submit a bill of particulars, we will examine the facts adduced at the suppression hearing held immediately after the district court's ruling on the defendant's original motion.

As the defendant backed his motor home out of his driveway on the evening of September 2, 2004, he hit his girlfriend, who died either from the impact or at some point before the police arrived on the scene. After Lieutenant LaBorde arrived on the scene at approximately 7:05 p.m. and was briefed regarding the accident, he ordered an officer to find the defendant and to have the defendant's blood drawn at the Oakdale Community Hospital. Lieutenant LaBorde recorded that the blood had been drawn at 9:10 p.m.

When the defendant left the scene of the accident, he left his motor home in the street with the engine running and the doors locked. In addition to the odd circumstances involving the motor home, Lieutenant LaBorde had, through reliable confidential informants, knowledge that the defendant used drugs. At 2:20 a.m., Oakdale police officers obtained a warrant to search the motor home. The officers contacted the defendant's sister, who gave them the keys to the defendant's motor home. Officers searched the motor home and seized several items, including pill bottles and latent fingerprints.

Based on the evidence found in the motor home, the police officers then, at 4:00 a.m. on September 3, 2004, applied for and received a second warrant authorizing them to search the defendant's residence. Starting at approximately 5:20

23

a.m., the officers searched the defendant's residence and seized more evidence: four bags of marijuana, two bags of suspected steroids, a bottle marked alprazolam containing numerous pills, a bottle containing Xanex and hydrocodone tablets, numerous Vicodin tablets, a Xanex bottle containing alprazolam, several empty bottles, hand notes, and $13,900.00 in cash.

Thus, the fatal accident in front of the defendant's home triggered the search of the motor home abandoned in the street in front of the defendant's home, and the initial search created probable cause to search the defendant's home. The series of events, all occurring at the same address, took less than twelve hours, and there is no evidence that the investigation halted at any time during those twelve hours. We find that the charges, which all arise out of that twelve-hour investigation, are connected and could be classified as arising from the same act or transaction. Therefore, the trial court did not abuse its discretion in finding that these charges satisfied the requirements of La.Code Crim.P. art. 493.2.

If a trial court determines that the offenses are connected to each other or constitute the same act or transaction, it must then evaluate whether the defendant would be prejudiced if the offenses were tried together:

> Where the offenses joined are connected with or constitute parts of the same transaction, the critical question which must be determined by the trial judge presented with a motion for severance of offenses is whether, in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

*Carter*, 362 So.2d at 514 (footnote omitted). The defendant bears a heavy burden of proof when he alleges prejudicial joinder of charges because, generally, there is no prejudice "if the facts of each offense are not complex and there is little likelihood that the jury will be confused by the evidence of more than one crime." *Simmons*,

24

848 So.2d at 64. "The defendant has a heavy burden of proof when he alleges prejudicial joinder. For an appellate court to reverse the trial court's ruling, there must be a clear showing of prejudice." *State v. Machon*, 410 So.2d 1065, 1068 (La.1982); *see also*, *State v. Crochet*, 05-123 (La. 6/23/06), 931 So.2d 1083.

In order to determine whether the defendant was prejudiced by the joinder, the trial court should consider:

> [1] whether the jury would be confused by the various charges; [2] whether the jury would be able to segregate the various charges and evidence; [3] whether the defendant could be confounded in presenting his various defenses; [4] whether the crimes charged would be used by the jury to infer a criminal disposition and finally, [5] whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile.

*Id*. at 1087 (citing *State v. Washington*, 386 So.2d 1368, 1371 (La. 1980)). "If it appears that a defendant or the state is prejudiced by [the] joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires." La.Code Crim.P. art. 495.1.

In denying the defendant's first motion to quash, the trial court examined the factors set forth in La.Code Crim.P. art. 495.1, *Carter*, and *Crochet*. The district court concluded that the defendant failed to prove prejudice because the facts of the separate offenses would not confuse the jury, because the jury should be able to segregate the various charges without difficulty, because the offenses charged are clearly distinguishable, because the facts for each charge are uncomplicated, because there was no evidence the district attorney filed the charges together to demonstrate the defendant's criminal propensity, because the defendant failed to show he would be confounded by presenting his defenses to the jury, and because the defendant

failed to show the inclusion of the vehicular homicide charge would make the jury hostile toward the defendant.

In his Supplemental Motion to Quash or Alternatively to Sever Counts, the defendant contends that he would be prejudiced by the joinder of the offenses because the introduction of evidence at trial concerning the defendant's possession of drugs could possibly lead the jurors to conclude that the defendant uses drugs and was using them at the time of the accident. This contention does not add to any of the considerations that the trial court evaluated in the defendant's original motion to quash. In the original motion to quash, the district court also had to consider whether the jurors would be able to distinguish between consumption and possession and whether the jurors would be able to intelligently apply the consumption and possession evidence to the appropriate charge.

We find that the average juror should easily be able to distinguish between having controlled dangerous substances outside of the body and having those same substances inside the body. Therefore, the trial court did not abuse its discretion in determining that the jurors would be able to distinguish between the types of evidence and to intelligently apply the appropriate facts to the different offenses.

This assignment of error is without merit. The writ is, therefore, denied.

Accordingly, for the reasons stated above, the writs filed by both the defendant and the state are denied.

**WRITS DENIED.**

STATE OF LOUISIANA

VERSUS

MICHAEL GORDON


**COOKS, J., dissents in part.**

I respectfully dissent from the majority's decision to affirm the suppression of the toxicology report. Initially, I note the opinion hinges its result on the fact that the State failed to establish that Officer LaBorde had probable cause to believe Defendant was under the influence when he ordered the blood test. The opinion specifically states as follows:

> As stated by the trial court, the prosecution failed to establish that reasonable grounds existed to believe that the defendant had been driving under the influence of an intoxicating substance.

There are a number of problems with that conclusion. First, as will be discussed in detail later, I find the record establishes a clear basis for probable cause on the part of Officer LaBorde to believe Defendant may have been under the influence of intoxicating substances when he ran over the victim. Second, a review of the record reveals the trial court DID NOT state that "the prosecution failed to establish that reasonable grounds existed to believe that the defendant had been driving under the influence of an intoxicating substance." Lastly, the trial court specifically based its ruling on an alleged uncertainty over what rights were read to Defendant, and not on the issue of probable cause. The following colloquy occurred at the close of the hearing:

> THE COURT:
> I understand that. Was there any evidence presented that there was probable cause?

MR. GREEN: (Counsel for the State)

I believe the probable cause for it was presented at the last hearing with agent Scotty LaBorde, and what he had to do in his investigation. In fact the drugs were found in the vehicle, drugs were found in the home. That was handled, I believe in the other hearing.

MR. SMALL: (Counsel for Defendant)

It was handled in the other hearing, and let me refer to page forty-eight, "At the time you instructed Officer West to transport Dr. Gordon to a hospital to have blood drawn, at that time were you possessed or were you aware of evidence which caused you to believe there was probable cause to think that he was under the influence of alcohol or controlled substances at the time he was operating the vehicle that apparently struck Ms. Hoskins? No, sir." Clear as a - -

THE COURT:

Right. That is my recollection also. Plus, even if you - - even if there was probable cause Officer West said, well the fact that he was advised that he could take an additional test was on the form, but - - I don't know what is on a standard form because a copy of a standard form wasn't presented into evidence or shown to Officer West to show what he would have read. And that is the problem that we see. So, even if you say or we don't need to read 661 (C) (c) (1) those rights, which I think you do have to read, I mean advise them anyway, there is no way to know whether or not he was advised that there was an additional test that needed to be run. And when you look at 666, when they talk about the additional test - - that is going to be, I'm sorry, 664(B), when he is supposed to be advised of the independent test, you know the Off - - there is no proof that that was read or even that the Court can glean that it was read because the Court doesn't know if it is on it or not.

MR. GREEN:

I believe whenever Mr. Small was asking the question as to, was these certain rights specifically read, Officer West said that he could not specifically remember - -

THE COURT:

That is correct.

MR. GREEN:

- - but those are the rights on the form that he would read.

THE COURT:

I understand that. But, then whenever he asked about certain other rights he just said, no, I didn't specifically said - - no, I didn't specifically say that. As to 664, as to that right, he said that is on the form. As to the consequences of 14:98.2, he said, yeah, that is on the form. But as to rights of 661(C)(1), he would specifically say, no, no, no, I can't specifically recall, I can't specifically recall. And I think that is vital. There is some things that are not fatal, for example, there is no writing to indicate that - - that they - - designate at arriving what conditions the test were to be - - under what conditions the test would

be administered, well, I don't think that is fatal, or that they didn't have a sworn report saying what they - - what they did do, I mean, they obviously don't cause they don't have anything. So, I think that is a real problem. How do you respond to that Mr. Green?

MR. GREEN:
   With the problems as far as the rights form, I think they had already testified that they couldn't find that specific rights form.

THE COURT:
   No, I understand that.

MR. GREEN:
   Yes, ma'am.

THE COURT:
   But as to testimony to overcome that, to show that these are the rights that I did read because I always read them and these are the ones.

MR. GREEN:
   My understanding was that the Officer testified that those specific rights were the kind that he would ordinarily read and did so in that situation. I think I specifically asked him, did you read to him those rights.

THE COURT:
   I understand that, but I don't know what those rights are. You didn't go over each one or show him a copy so I don't know that that is what was read, I mean there has been no evidence to show that. As I said, the failure of 32:661(A) (2) (a), I don't think that is fatal. I think that the person who - - the registered nurse actually drew the blood, I don't think she has to know what kind of preservatives in there. There is some problems with the kit. The testor, I think was certified by the state. He didn't say he had a valid permit, but he had a certification. And he did test his machine on a daily basis, both the gas chromatograph and the sprectrometer. Those were tested on a daily basis if they wouldn't work. He tested two samples to make sure - - if there would have been a difference then that would have presented a problem. So, I mean, he was qualified - - eight years of experience, had the necessary background. What I have a problem with are due process and constitutional rights read to Mr. Gordon. I don't think there was sufficient proof to show that. So, the test results are suppressed.

   Although the trial court referenced the probable cause issue, it made no definitive ruling in that area, and based its judgment on different grounds. Despite this, the proposed opinion states:

   The prosecution does not object to or seek review of the trial court's finding that the state's failure to establish reasonable grounds for believing the defendant to have been intoxicated while driving the

vehicle was fatal to the admissibility of the blood analysis. Review of the evidence submitted at both hearings shows that Lieutenant LaBorde ordered the blood test solely on the basis that there was a fatality involved in the accident and that Officer West administered the test strictly in response to Lieutenant LaBorde's orders.

Thus, there is no merit in this assignment of error because the prosecution failed to establish either reasonable grounds or probable cause to believe that the defendant had been operating the motor home under the influence of an intoxicating substance.

It is unreasonable to hold the State at fault for failing to address an issue which was not the basis for the trial court's ruling. The State's brief before this court addressed the question of whether the appropriate rights were read to Defendant, which was the issue the trial court based its ruling on.

Further, I find the record establishes that Officer LaBorde had reasonable grounds to believe Defendant had been operating his vehicle under the influence of an intoxicating substance. Although Officer LaBorde answered in the negative when questioned whether, at the time he ordered the blood test, he had probable cause to think that Defendant was under the influence of alcohol or controlled substances at the time he ran over his wife, his actions at the scene and other testimony at trial establish probable cause.

The prosecution noted that, while at the scene, Officer LaBorde ordered a drug dog to search for drugs. Officer LaBorde also secured warrants to search Defendant's mobile home and residence for drugs. Officer LaBorde testified he had previous knowledge from "confidential informants or reliable persons indicating to [him] that Dr. Gordon used drugs." Officer LaBorde also acknowledged he was very familiar with defendant, having associated with him in social settings. Defendant's behavior coupled with the officer's knowledge of past drug use by Defendant, provides more than reasonable grounds to assume possible intoxication. Taking into account the entire picture, any reasonable person, and especially any reasonable police officer, would have a particularized and objective basis for suspecting Defendant's possible

intoxication. Probable cause does not rest on an officer's subjective beliefs or attitudes but turns on a completely objective evaluation of all of the circumstances known to the officer at the time of his challenged action. *See State v. Kalie*, 96-2650 (La. 9/19/97), 699 So.2d 879. The United States Supreme Court has held an officer's subjective determination as to whether or not he had probable cause to arrest is not determinative of the issue. *See Florida v. Royer*, 460 U.S. 491, 507 (1983) (plurality). The officers who seized Royer at the airport and searched his suitcase did not believe there was probable cause to arrest and proceeded on a consensual or Terry-stop rationale. Nevertheless, the Supreme Court recognized that the officers' belief did not foreclose the State from justifying Royer's custody by proving probable cause. 460 U.S. at 507. Whether or not there is probable cause must be assessed under an objective standard. *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993). "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's actions does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 138 (1978).

Accordingly, I do not find Officer LaBorde's testimony with respect to whether or not he had probable cause to order the blood test determinative on this issue. Despite Officer LaBorde's puzzling answer to defense counsel's question, I find the record clearly established that reasonable grounds existed to believe the Defendant may have been driving under the influence of an intoxicating substance.

As to whether Defendant's due process rights were violated, I find they were not. It was undisputed that the actual standard rights form, which was signed by Defendant, could not be located by the State and presented as evidence at the suppression hearing. However, the testimony elicited at the hearings established the standard rights found in La.R.S. 32:661(c)(1) were read to defendant. Officer Virgil

West testified he read the rights form to the Defendant, and that it was the form that had been in use with the Oakdale Police Department for many years. Officer West testified as follows:

> Q. Okay. And just so that we are clear on the record, in what way is the form we are discussing now different than the plain Miranda form?
>
> A. Well, it list - - it lists your Miranda rights on it but it also lists consequences if you refuse the test, how much amount of time you have to serve if you fail the test, different things like that.
>
> Q. Right. And it lists a number of thins that are listed in Title 32 regarding chemical test. Is that your understanding?
>
> A. Yes, sir.

Officer West testified he was positive he read the rights off the DWI chemical testing form, stating "if it is on that rights form, I read it to him."

Nurse Charlotte Eschette, who drew the blood sample, recalled waiting for Officer West to read the rights form to Defendant. She stated:

> Q. Okay. You testified earlier ma'am - - I don't know if you testified to this, but you wait for the reading of the rights in relation to chemical test.
>
> A. Yes, sir.
>
> Q. Did that happen in this case?
>
> A. Yes, sir.
>
> . . .
>
> Q. Okay. And you said that you had heard one of the officers read Mr. Gordon his rights?
>
> A. Yes, sir. I think Virgil is the one who did it.
>
> Q. And you - - I don't know if you testified before or not to that, but you state that you heard those rights being read before?
>
> A. Yes, sir.
>
> Q. Okay. Would these be the rights relating to a chemical test?
>
> A. Yes, sir.

Q.    For drawing blood?

A.    Yes, sir.

Q.    Okay.  I mean, in other words, are you familiar with what the Miranda rights are?

A.    Yes, sir.

Q.    Was it a short Miranda rights or was it a - -

A.    It was a long one.

Q.    Okay.  How long did it take him to read that?

A.    It takes him a little while - -

Q.    Okay.

A.    - - because it is very lengthy.

The record establishes Defendant was provided due process in the drawing of blood.  The State notes Defendant voluntarily waived his Miranda rights prior to consenting to the chemical test.  Both Officer West and Nurse Eschette testified Defendant voluntarily consented to the blood draw.  Further, prior to the actual drawing of blood, defendant was read the rights found in Title 32 relating to the chemical test.  Therefore, Defendant received sufficient due process and was fully informed of his constitutional rights.  The trial court erred in granting Defendant's Motion to Suppress the toxicology report.  I would grant the State's writ on this issue.